**Delorise BROWN, Plaintiff,**

v.

**Michelle MITCHELL, et al., Defendants.**

**No. CIV.A. 3:03CV820.**

United States District Court, E.D. Virginia, Richmond Division.

July 28, 2004.

James B. Thorsen, Christopher C. Booberg, Craig J. Curwood, Thosen & Scher LLP, Richmond, VA, for Plaintiff.

John A. Gibney, Jr., Thompson & McMullan, Richmond, VA, for Mitchell.

Elizabeth S. Skilling, Harman Claytor Corrigan & Wellman, Glen Allen, VA, for Freund.

Phillip L. Hairston, William J. Hoppe, Office of the City Attorney, Richmond, VA, for the City.

## MEMORANDUM OPINION

PAYNE, District Judge.

At the time of his death Steven R. Stevenson ("Stevenson") was an inmate serving a sentence in the City Jail for the City of Richmond, Virginia (the "Jail") for failure to pay child support. The Plaintiff, Delorise Brown ("Brown"), Stevenson's mother, in her capacity as the administratrix of her son's estate, filed an action in the Circuit Court for the City of Richmond, Virginia against the City of Richmond, Virginia (the "City"), Richmond City Sheriff Michelle Mitchell ("Mitchell" or the "Sheriff"), Chief Physician of the Jail Dr. Jack Freund ("Dr. Freund"), and John Does 1–10, unidentified deputy guards employed at the Jail, alleging violations of 42 U.S.C. § 1983 and Virginia law.

Pursuant to 28 U.S.C. § 1441, the Defendants removed the action to federal

court.[1] The Court, therefore, has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over the claims brought pursuant to 42 U.S.C. § 1983, and it has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims.

All of the Defendants, save John Does 1–10,[2] have filed motions pursuant to Fed. R.Civ.P. 56 seeking summary judgment respecting the claims pending against them. For the reasons stated below, these motions will be granted in part and denied in part.

## STATEMENT OF FACTS

Consistent with the constraints of Fed. R.Civ.P. 56, the facts recited here are based on deposition testimony, affidavits, documentary evidence in the record, and the parties' various statements of material facts, to the extent that such statements of facts are undisputed. *Power v. Kaiser Found. Health Plan,* 87 F.Supp.2d 545, 547 n. 2 (E.D.Va.2000). Where there is a dispute, the differing versions are identified. Of course, in considering the motions for summary judgment, Brown, as the nonmoving party, is entitled to have her version of all that is disputed accepted and to have the benefit of all favorable inferences. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## I. The Circumstances of Stevenson's Incarceration and Death

Beginning on July 23, 2001, Stevenson was incarcerated in the Jail for failure to pay child support. As part of Stevenson's commitment to the Jail, the Jail staff completed a medical history and screening. At that time, Stevenson reported good health. He did, however, inform his jailors that he had suffered a gunshot wound in 1997, as a result of which Stevenson lost his spleen. Stevenson apparently informed the Jail staff that, because of his condition, he had been placed apart from the general population in previous incarcerations. On the occasion of this confinement, however, Jail staff assigned Stevenson to Tier G–3, a general population unit in the Jail.

By August 7, 2001, approximately two weeks after entering the Jail, Stevenson began to suffer from severe headaches. Stevenson complained of these headaches to his fellow inmates, the on-duty nurse, as well as to several deputy guards. On the afternoon of August 7, 2001, deputy guards allowed Stevenson to visit the Jail's medical clinic where medical personnel provided him with nonprescription cold medicine. Stevenson's condition, however, did not respond to this medication, and he continued to suffer from increasingly severe headaches.

By August 8, Stevenson had become too weak to carry his food tray in the mess hall. A fellow inmate, therefore, needed to assist Stevenson in obtaining and carrying his meal. Affidavit of Walker, at 4 ¶ 24. During the course of this meal, and within plain view of the deputies who were patrolling the mess hall, Stevenson vomited. Upon witnessing Stevenson's vomiting, the deputy guards thereafter excused him to return to his cell. Affidavit of Miles, at 6 ¶ 38. That evening, after returning to his

---

**1.** John Does 1–10, being unidentified, did not consent to this removal. At the time of removal, however, those defendants had not been served with state court process; thus, there was no need for them to have joined in the removal request. *See* 16 James Wm. Moore *et al., Moore's Federal Practice* § 107.11[1][d] (3d ed.2003).

**2.** For reasons neither explained nor readily apparent, it appears that the action has not been prosecuted against these unnamed defendants. Hence, the Plaintiff will be ordered to show cause why, as to them, the action should not be dismissed for want of prosecution.

cell, Stevenson continued to complain about severe pain in his head and stomach; he had also, by that time, begun to sweat heavily and constantly. Affidavit of Peete, at 5 ¶ 30.

By August 9, 2001, Stevenson was so sick that he stopped attending meals altogether. Affidavit of Walker, at 5 ¶ 31. In fact, Stevenson did not leave Tier G–3 at all that day. Instead, Stevenson remained in his bunk [3] dressed only in his underwear, complaining of chills, inability to eat, and persistent heavy sweating. His fellow inmates, in an attempt to cool Stevenson down, repeatedly applied wet towels to Stevenson's head and body and attempted to provide him with liquids. Id. at 5 ¶ 32. The deputies patrolling Tier G–3 witnessed the inmates' provision of rudimentary medical assistance; nonetheless, these guards did nothing to assist Stevenson.

Stevenson's only outing from his cell on August 9 was when several inmates helped carry him to the canteen so that he could purchase several personal items. Affidavit of Walker, at 5 ¶ 36. The numerous deputies who were stationed on Tier G–3 and at the canteen witnessed this event, and thus were aware of Stevenson's inability to walk under his own power. These guards, however, did not in any way assist Stevenson and his fellow inmates.

Moreover, throughout the day on August 9, Stevenson's fellow inmates repeatedly informed deputies of Stevenson's increasingly deteriorating condition and requested that Stevenson receive medical attention. Affidavit of Walker, at 5 ¶ 38. All told, Stevenson's fellow inmates requested assistance from deputies approximately twenty times that day. Affidavit of Peete, at 6 ¶ 41. The deputies, however, ignored these requests. Id. at 6 ¶ 42. Moreover, notwithstanding that, during the "count" [4] on August 9, Stevenson was so debilitated that his fellow inmates needed to carry him to the front of his cell, the deputies conducting the count did nothing to address Stevenson's condition. Affidavit of Miles, at 8 ¶ 55. In fact, the deputies conducting the count ignored Stevenson's personal pleas for medical assistance. Affidavit of Walker, at 6 ¶ 43. Thereafter, throughout the evening of August 9, Stevenson continued to suffer and to vomit on a fairly regular basis.

By the next day, August 10, 2001, Stevenson was more-or-less unresponsive to exterior stimuli, was sweating profusely, and—despite having missed meals for almost two days—was throwing up on a near-constant basis. Affidavit of Walker, at 6 ¶ 45. Stevenson was so nauseated that he was unable to eat the food and drink that his fellow inmates had procured from the canteen. Affidavit of Peete, at 6 ¶ 45. Because they recognized Stevenson's symptoms as serious, his fellow inmates repeatedly appealed to the deputy guards for assistance. For most of the day, however, these appeals went ignored. Affidavit of Walker, at 6 ¶ 50. The deputies patrolling the tier looked at Stevenson, heard the other inmates' pleas, and then left without taking any action in spite of the fact that Stevenson was obviously quite ill.[5] Finally, however, that afternoon, after

---

3. By this point, Stevenson's fellow inmates had moved him from the top bunk-bed where he had been sleeping to a bottom bunk-bed because he was no longer able to climb into the higher bed. Affidavit of Walker, at 5 ¶ 35.

4. The "count" is when every inmate lines up outside of his or her cell so that the deputy guards can count them and ensure that all the inmates are present and in their designated areas.

5. One deputy, upon observing Stevenson's condition on August 10, indicated to the inmates that they should drag Stevenson to the front of the cell so that the guards would not need to carry him very far in the event that Stevenson lost consciousness and needed to be removed from the cell. Affidavit of Peete, at 7 ¶ 49. The inmates, however, ignored this rather callous request.

many pleas from Stevenson's fellow inmates, the guards allowed Stevenson to see a nurse who, after a brief evaluation, referred Stevenson for an examination by a doctor.

Upon referral from the nurse, the Chief Physician of the Jail, Dr. Freund, examined Stevenson. Dr. Freund gauged Stevenson's temperature at 101.2 degrees. Second Suppl. Decl. of Freund, at 2 ¶ 13.[6] Dr. Freund says that Stevenson had a moderately dry tongue, greater than normal bowel sounds, and enlarged nodes in the left axillar region.[7] In the course of his examination of the demonstrably ill, weak patient, Dr. Freund checked Stevenson's abdomen, throat, lungs, and neck in an effort to determine whether Stevenson had localizing signs of bacterial infection; in particular, Dr. Freund performed a nuchal rigidity test. These examinations, according to Dr. Freund, returned negative indications for bacterial infection. It is undisputed, however, that Dr. Freund did not engage in any further testing aimed at ascertaining the existence of a bacterial infection.

6. It is undisputed that, upon reading Stevenson's chart, Dr. Freund learned that Stevenson had suffered a gunshot wound in 1997 and consequently had no spleen.

7. In his declaration and deposition testimony, Dr. Freund asserts that, during this examination, Stevenson was alert, coherent, and cooperative. This testimony, however, is in obvious contrast with the sworn statements of several of Stevenson's fellow inmates who observed Stevenson immediately before and after the examination. On summary judgment, of course, Brown, as the nonmoving party, is entitled to have all factual disputes resolved in her favor. Specifically, she is entitled to the inference that, as supported by several affidavits, during Dr. Freund's examination, Stevenson was visibly ill and weak and was not significantly responsive to external stimuli.

Upon completion of the examination, Dr. Freund, according to his sworn testimony, diagnosed Stevenson's condition as a viral infection with dehydration. Dr. Freund thereafter prescribed a fever reducer and a medicine to quell Stevenson's nausea.[8] Dr. Freund also ordered that Jail staff monitor Stevenson's temperature daily,[9] place Stevenson on a liquid diet, and administer the prescribed nausea medication. Second Suppl. Decl. of Freund, at 3 ¶ 18. He further ordered Jail personnel to return Stevenson to the clinic on August 14. He then ordered Stevenson to return to the general population unit of the Jail.

Thus, in accord with Dr. Freund's orders, Stevenson returned to the Jail on the evening of August 10. Throughout that night, his fellow inmates continued to apply damp cloths to Stevenson's head and body and to provide him with liquids. Affidavit of Miles, at 9 ¶ 69. They also assisted Stevenson with vomiting and in removing his vomit from the cell. Throughout these endeavors, the inmates asked repeatedly for assistance from the deputy guards.

8. Respecting the nausea, Dr. Freund prescribed Compazine. According to Brown's medical expert, however, Dr. Freund prescribed an amount of Compazine which exceeded the usual maximum dosage by fifty percent. Clark Affidavit, at 4. From that Brown is entitled to the inference that Dr. Freund viewed Stevenson's nausea as so severe that it required far more medication (fifty percent) than the standard dosage.

9. Dr. Freund contends that he ordered Jail staff to gauge Stevenson's temperature four times a day. Brown, however, offers evidence that Dr. Freund in fact ordered that Jail personnel only gauge Stevenson's temperature once every day for the next four days, as opposed to four times per day. See Womack Depo., March 3, 2004, at 51. And, at the summary judgment stage, such a factual dispute must of course be resolved in the nonmoving party's favor.

At some point that night, Stevenson began to throw up a green, mucus-like substance. Thereafter, Stevenson's fellow inmates were unable to elicit a response from him. Affidavit of Peete, at 8 ¶ 55. The inmates, having had limited success in gaining the guards' attention through normal channels, began to make loud noises, banging on the bars of the cell and yelling. Finally, a deputy responded to these efforts, and, upon seeing Stevenson and hearing the inmates' concerns, instructed the inmates that Stevenson's cell was too hot and that they should attempt to get him out of bed so that he could get some air. Affidavit of Walker, at 9 ¶ 74. The deputy then left Stevenson and the inmates to their own devices.

Shortly thereafter, the inmates again summoned the deputy in order to tell him that their attempts to revive Stevenson had proved fruitless. The deputy responded, entered the cell, and attempted unsuccessfully to communicate verbally with Stevenson. Affidavit of Walker, at 9 ¶ 75. The deputy then began to shake Stevenson and to slap his face. When these attempts at revival failed to achieve the desired result, the deputy summoned the on-duty nurse. *Id.* at 9 ¶ 76.

Sometime during the early morning hours of August 11, a nurse arrived at Stevenson's cell and proceeded to slap him about his face, ultimately holding something in front of his nose that caused his body to go into convulsions. Affidavit of Peete, at 8 ¶ 65. When these measures failed to revive Stevenson, the nurse ordered that he be taken to the emergency room at the Virginia Commonwealth University–Medical College of Virginia Hospital (the "VCU–MCV Hospital"). Steven-son arrived at the VCU–MCV Hospital at approximately 2:10 AM that morning, at which point he was completely unresponsive and suffering from acute liver, renal, and cardiac failure as the result of overwhelming sepsis. Less than forty-eight hours later, at 7:55 AM on August 13, 2001, Stevenson died of bacterial meningitis at the VCU–MCV Hospital.

## II. Background Respecting the Richmond City Jail

Brown alleges that, at the time of Stevenson's death, the Jail was overcrowded, poorly ventilated, and unsanitary and that these conditions caused, or contributed to cause, Stevenson's death. It is necessary, therefore, to consider somewhat the Jail itself and its history.

Built in 1964, the Jail was originally designed to house approximately 630 inmates. Mitchell Depo., Feb. 19, 2004, at 20; *see generally* A Community–Based Corrections Plan, Prepared for the City of Richmond by Powell Consulting Services, May 31, 2001 (hereinafter the "2001 CBCP").[10] The Jail, which the City owns in fee simple, is a three story structure; the aggregate floor space in the Jail is approximately 195,096 square feet. 2001 CBCP, at 10. At the time of Stevenson's incarceration and death, the Jail was operating at more than double its design capacity, averaging a population of between 1,400 and 1,500 inmates per day. Mitchell Depo., Feb. 19, 2004, at 22.

Moreover, Brown offers evidence showing that overpopulation and sanitation have been persistent, and worsening, problems at the Jail for about two decades. Brown has proffered a large volume of

---

**10.** The Richmond City Jail System consists of three main components: the Jail itself, the City Lock–Up (which houses inmates and suspects on a temporary basis), and the Peumansend Creek Regional Jail (which is shared by the City with five other jurisdictions—the City has the right to occupy 100 of the facility's 366 beds). The Jail itself, however, is the only structure implicated in this action.

evidence on that score, including numerous letters to and from various City officials, such as a 1975 letter from then-Richmond City Sheriff Andrew Winston ("Winston") to former City Manager William Leidinger in which Winston complains of dangerous overcrowding and sanitation problems at the Jail,[11] and a 1987 letter from Winston to former City Manager Robert Bobb ("Bobb") reiterating those problems.

Brown's evidence also includes the fact that, in 1988, Winston filed in the Circuit Court for the City of Richmond a Bill of Complaint against Edward W. Murray ("Murray"), who was then the Director of the Department of Corrections for the Commonwealth of Virginia (the "Department of Corrections"). The City, as well as the State Board of Corrections for the Commonwealth of Virginia (the "Board of Corrections"), were also defendants in that case.[12] Winston's Bill of Complaint alleged, *inter alia*, that the dilapidated, unsanitary, and overcrowded conditions in the Jail represented health and safety dangers to the inmates.

Ultimately, in a letter opinion dated January 31, 1989, Virginia Circuit Court Judge James Wilkinson, after reviewing evidence and testimony, set forth a full set of findings of facts and conclusions of law. Judge Wilkinson concluded that the maximum number of inmates that could be safely housed at the Jail was 700 and that the Jail, at that time (1989), was grossly overcrowded. Thereafter, Winston agreed to settle the suit upon securing the City's commitment to build a new facility in which to house female inmates,[13] as well as Murray's promise to remove from the Jail on a timely basis state prisoners being housed there temporarily. Judge Wilkinson dismissed the settled suit by entering a consent order on March 9, 1989.

Brown has offered evidence that, although the 1989 settlement of Winston's suit alleviated the overcrowding and sanitation problems for a while, the problems of overcrowding and sanitation at the Jail gradually thereafter worsened. For example, Mitchell has testified that, notwithstanding the addition of the female annex, many of the Jail conditions described in Winston's Bill of Complaint once again existed in the late 1990s and that, in fact, some problems—such as overcrowding—became considerably worse in the years subsequent to the settlement of Winston's suit. Mitchell Depo., Feb. 19, 2004, at 36.[14]

Mitchell served as a deputy under Winston; thus, at the time she assumed her current office, she was fully aware of the abysmal conditions at the Jail. In 1994, during the first budget cycle of her tenure as Sheriff, Mitchell spoke with then-City Manager Bobb in an effort to apprise him

---

**11.** Under Virginia law, sheriffs—who are elected, Va.Code Ann. § 15.2–1609, constitutional officers separate and distinct from the localities in which they serve, Va. Const. art. VII, § 4—are responsible for the day to day operations and maintenance of the local jails. Va.Code Ann. § 53.1–116 *et seq.* Virginia sheriffs, however, have no ability to institute capital improvements to jail facilities; rather, the local governments themselves are responsible for the physical maintenance and structural upkeep of the local jails. Va.Code Ann. § 15.2–1638; *see also Strickler v. Waters*, 989 F.2d 1375, 1390 (4th Cir.1993); *May v. Newhart*, 822 F.Supp. 1233, 1235–36 (E.D.Va. 1993).

**12.** That case, which proceeded in the Circuit Court for the City of Richmond, Virginia, Manchester Division, was styled *Winston v. Murray*, Civ. No. A–3398–C.

**13.** This structure, which is an annex to the Jail, was completed in 1992 and contains 100 beds. 2001 CBCP, at 2.

**14.** Mitchell assumed her current position in 1994. Before rising to the level of Sheriff, however, Mitchell held various lower-level positions in that office under Winston. Mitchell Depo., Feb. 19, 2004, at 7–17.

and the City of the need for a new or expanded jail facility. Mitchell Depo., Feb. 19, 2004, at 62. Thereafter, the City commissioned, through the City Manager's Office, a study to ascertain the City's jail-related needs and to provide information respecting whether the City needed to construct a new facility, or at least an addition to the current facility, and, if so, what its configuration should be.[15] To that end, the City retained a consulting group, the Correctional Services Group, Incorporated, which, in October 1994, submitted to the City a "Community Based Corrections Plan" (the "1994 CBCP"). This document analyzed trends in the City's jail population, assessed the Jail's incarceration capacity at the time, and estimated what the City's inmate population likely would be in the future.

As a result of the 1994 CBCP, which found the City's existing facilities to be lacking in several key respects, including their ability to house the number of inmates incarcerated by the City,[16] the City proposed to construct a 300 bed addition to the Jail. To this end, Cary Gill, an architect employed by the City, rendered various architectural plans and designs.[17] By late 1996, the City, through the City Manager's Office, was considering various plans for an addition to the Jail. Indeed, it appears that, by then, the City Council had gone so far as to earmark specific funds for the project. At some point in 1997,

however, the planned addition to the Jail—for reasons not apparent on this record—was cancelled, the City having reallocated the moneys that it had designated for that project to other endeavors.

Thereafter, on several occasions in the late 1990s, Mitchell asked City officials to build a new facility or, in the alternative, to make capital improvements to the existing Jail. During the late 1990s, Mitchell had several conversations with City Manager Dr. Calvin D. Jamison ("Dr. Jamison")[18] during which she informed him that the City needed to begin seriously to address the issues at the Jail, "because something [bad was going] to happen and [she did not] want to ... be responsible for it." Mitchell Depo., Feb. 19, 2004, at 90. According to Mitchell and indeed as corroborated by Dr. Jamison, these conversations centered on whether or not the Richmond City Council possessed the "political will or the muster to really champion the cause of people who were behind bars." *Id.* From these conversations, Mitchell apparently came to the conclusion that, if any improvements were to occur at the Jail, she would need to initiate them herself.

With this understanding, by 2000, Mitchell had retained outside legal counsel in an effort to ascertain whether Virginia law provided legal mechanisms that could be used to force the City to make improvements at the Jail. According to Mitchell,

---

**15.** Under Va.Code Ann. § 53.1–80(A), the Commonwealth will reimburse a city or county up to one quarter of the capital costs incurred in jail construction, enlargement, or renovation. In order to receive such state reimbursement, however, the city or county must, before breaking ground, gain project approval from the Board of Corrections. Further, under Va.Code Ann. § 53.1–82.1, in order to receive approval from the Board of Corrections, the local government must first generate and thereafter submit a "community based corrections plan" which discusses the local government's incarceration-related

needs and the feasibility of any proposed projects.

**16.** Notably, the 1994 CBCP noted that the Jail's 1994 housing capacity was insufficient for the Jail's 1994 population and for the projected inmate population.

**17.** An addendum to the 1994 CBCP was completed in 1996. That document reiterated the findings of the earlier report.

**18.** In November 1998, Dr. Calvin D. Jamison replaced Bobb as Richmond's City Manager.

she and her counsel undertook a review of Virginia law, "read[ing] the Code of Virginia," in an attempt to find devices that might be available to correct what Mitchell regarded as the serious problems at the Jail. Mitchell Depo., Feb. 19, 2004, at 91.

In addition, throughout the late 1990s and into 2000, Mitchell maintained at least a tenuous line of communication with the City Manager's Office, largely through William Johnson ("Johnson"), Deputy City Manager under Dr. Jamison.[19] Moreover, at some point in early 2000, Mitchell opened a dialogue with Joyce Davis ("Davis"), who, at that time, was a city planner working for the City. Davis, who, at the time, also was communicating with Dr. Jamison respecting the Jail, set up a meeting at Richmond City Hall. This meeting, which occurred in spring 2000, was attended by Davis, Mitchell, Ed Powell, individuals from the City Manager's Office, and various other City administrators. The purpose of this meeting was to discuss the City's need for a new or expanded jail facility.

The record permits the inference (if, indeed, it does not establish) that, at this meeting, all parties agreed that the Jail was seriously overcrowded and that there were various structural problems at the facility. Thereafter, the City, once again, requested the preparation of a community based corrections plan for ascertaining its incarceration needs. Jamison Depo., Feb. 19, 2004, at 32; *see also* Va.Code Ann. § 53.1–82.1. Thereafter, Powell Consulting Services completed, on May 31, 2001, the 2001 CBCP. Among other things, the 2001 CBCP concluded that the Jail had been functioning significantly above its operating capacity for several decades, and that, as of 2001, the Jail was "severely overcrowded." 2001 CBCP, at 79.[20] After engaging in an analysis of the more aggressive policing methods adopted by the Commonwealth and the City in the 1990s, as well as the resultant increases in the levels of arrests, convictions, and incarcerations in Richmond, the 2001 CBCP concluded that the City would soon require a facility capable of housing approximately 3,000 inmates. And, because the City's facilities (*i.e.*, the Jail, the Lock–Up, and Richmond's share of the Peumansend Creek structure) had, in 2001 (and indeed continue in 2004 to have), a total rated capacity of under 900 beds, the 2001 CBCP concluded that the City needed to secure a new or expanded facility capable of housing a far greater number of inmates than the existing facilities allowed.

As was true respecting the 1994 CBCP and the 1996 addendum thereto, the City elected not to follow the recommendation of the penal facility experts that it had hired to ascertain the need for corrective action. Indeed, as admitted by Dr. Jamison, notwithstanding the findings of the 2001 CBCP, the City had in 2001 (and in fact continues to have as of February 2004) no plans to build a new facility, or to expand or improve the existing Jail. Jamison Depo., Feb. 19, 2004, at 17. Mitchell testified respecting the 2001 CBCP:

---

19. At some point in 2000, Mitchell and Dr. Jamison had a "breakdown of communication" arising from a personal issue unrelated to the Jail. Mitchell Depo., Feb. 19, 2004, at 89. After this falling out, Dr. Jamison and Mitchell largely conducted the necessary communication between their respective offices through Deputy City Manager Johnson, who came to serve as a sort of liaison between the Sheriff and the City Manager.

20. The 2001 CBCP also concluded that, although the Jail was, at that time, only thirty-six years old, it had an "effective age" of approximately fifty to sixty years. The 2001 CBCP further concluded that, absent major renovations, the Jail was, at that time, nearing the end of its useful life. 2001 CBCP, at 17.

The document was produced. We received a copy of it, and that was the end of it. There has been no movement, as far as I am aware of, to do anything with that document.... After we got the plan and after a couple of months or maybe even longer, I had a conversation I think with Joyce [Davis], asking about the plan .... And, basically she said that she wasn't aware what was going on with it, and that was the end of it.

Mitchell Depo., Feb. 19, 2004, at 107–8.

On September 10, 2001, less than one month after Stevenson's death, Mitchell, in her official capacity as Sheriff, filed a Petition for Writ of Mandamus in the Circuit Court for the City of Richmond.[21] In her Petition, Mitchell avers that the Jail is in ill repair and is simply inadequate to house the number of inmates committed to the Jail by the City or to meet the needs of those confined at the Jail.[22] In addition to alleging that the Jail is too small for its current population, is in general disrepair, and is otherwise outdated, Mitchell's Petition alleges that the Jail suffers from poor heating and cooling systems[23] and lacks an adequate number of showers and toilets. More importantly for this action, the Petition alleges that, because of severe overcrowding, the Jail presents an unacceptably high risk of contagious disease spreading throughout the inmate population.[24] Finally, the Petition alleges that, although Mitchell, over time, has brought these concerns to the attention of the City and its administrators, the City has failed to take any corrective action. Mitchell's Petition is currently pending in the state court.[25]

### III. Counts Remaining after the Opinion on Motions Made Under Fed. R.Civ.P. 12(b)(6)

On March 9, 2004, the Court entered a Memorandum Opinion (hereinafter the "March 9 Opinion")[26] granting in part and denying in part the Defendants' motions for dismissal under Fed.R.Civ.P. 12(b)(6). First, the Court, relying on Virginia's law of sovereign immunity, dismissed a state-law tort claim that Brown had instituted

---

21. *See generally* Va.Code Ann. § 53.1–71 ("When it shall appear to the circuit court of any ... city that ... the jail of such ... city is insecure, out of repair or otherwise inadequate, it shall be the duty of such court to award a rule in the name of the Commonwealth against the governing body of the ... city to show cause why a writ of mandamus should not issue commanding the governing body to ... cause the ... jail of such ... city to be made secure, put in good repair, or rendered otherwise adequate, as the case may be.").

22. The City correctly notes that, because Mitchell filed her Petition after Stevenson's death, the fact of that lawsuit in no way afforded the City any notice relevant to this action. The City's correct statement, however, largely misses the mark because Mitchell's Petition avers that, before filing suit, she repeatedly had brought the Jail's conditions to the attention of the City's administration. In other words, the 2001 Petition itself alleges that Mitchell had brought the Jail's problems to the City's attention long before Stevenson's death.

23. Mitchell has testified that, during the summer months, temperatures inside the Jail can exceed 100 degrees. Mitchell Depo., Feb. 19, 2004, at 55.

24. During her deposition in this action, Mitchell testified that, in the summer of 1999, there was a staphylococci infection outbreak among Jail prisoners; this outbreak resulted in many inmates suffering from boils and other skin ailments. Mitchell Depo., Feb. 19, 2004, at 53. Mitchell herself attributed this outbreak to the high heat and overcrowding at the Jail.

25. Counsel have advised that, some two and a half years after filing, Mitchell's state-court suit, rather remarkably, is still in the discovery stage.

26. The March 9 Opinion is available at *Brown v. Mitchell*, 308 F.Supp.2d 682 (E.D.Va.2004).

against the City. *Brown,* 308 F.Supp.2d at 691 (citing, *inter alia, Taylor v. City of Charlottesville,* 240 Va. 367, 397 S.E.2d 832, 834 (1990); *Franklin v. Richlands,* 161 Va. 156, 170 S.E. 718, 721 (1933)). It further dismissed the 42 U.S.C. § 1983 allegation pending against the City insofar as Brown had sought punitive damages. 308 F.Supp.2d at 695 n. 14 (citing *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)). Respecting Mitchell, the Court, after undertaking an examination of the Code of Virginia, cabined the purported Jail conditions for which Mitchell could, as a matter of law, be responsible. 308 F.Supp.2d at 699. Finally, the Court dismissed, for failure to state a claim, the Section 1983 claim pending against Dr. Freund. *Id.* at 708.

The Court, however, allowed Brown to file an amended complaint in order to afford her an opportunity to remedy several perceived technical deficiencies present in the original Complaint, particularly Brown's Section 1983 claim against Dr. Freund. *Id.* at 708–9. After the March 9 Opinion and the filing of Brown's First Amended Complaint ("FAC"), the following claims against the following parties remain:

- Count I relies on 42 U.S.C. § 1983, charging that Mitchell and the City, pursuant to an official policy or custom, maintained a crowded, poorly ventilated, and unsanitary jail, which reflected a deliberate indifference to Stevenson's rights, as secured by the Eighth Amendment to the United States Constitution, to be free from cruel and unusual punishment and that this policy or custom caused, or contributed to cause, Stevenson's death.
- Count II also relies on Section 1983, charging that Mitchell failed to train her staff to respond adequately to inmates' medical problems, thereby demonstrating a deliberate indifference to Stevenson's Eighth Amendment right to be free from cruel and unusual punishment, and that this failure to train caused, or contributed to cause, Stevenson's death.
- Count III proceeds under Section 1983, charging that John Does 1–10, unidentified guards employed by the Jail, were deliberately indifferent to Stevenson's serious medical condition and thereby violated his rights under the Eighth Amendment.
- Count IV relies on Section 1983, charging that Dr. Freund was deliberately indifferent to Stevenson's serious medical needs in violation of Stevenson's Eighth Amendment rights and that, through his indifference, Dr. Freund caused, or contributed to cause, Stevenson's death.
- Count V alleges a state law wrongful death action against Mitchell, claiming that the grossly negligent policies and practices of the Sheriff were a cause of Stevenson's death. Va.Code Ann. § 8.01–50.
- Count VI alleges a state-law wrongful death action against John Does 1–10.
- Finally, both Count VII and VIII allege state law actions against Dr. Freund, alleging wrongful death, Va. Code Ann. § 8.01–50, and medical malpractice, Va.Code Ann. § 8.01–581.1 *et seq.,* respectively.

After the close of discovery, the City, Mitchell, and Dr. Freund moved for summary judgment as to the respective, remaining counts pending against them. For the reasons explained below, those motions will be granted in part and denied in part.

## DISCUSSION

### I. The Standard for Assessing Motions for Summary Judgment

The standards applicable to summary judgment motions are well-established.

Summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the Federal Rules of Civil Procedure, designed to secure the just and expeditious resolution of every civil matter. *Graham v. PACTIV Benefits Comm.*, 301 F.Supp.2d 483, 491–492 (E.D.Va.2004).

In reviewing a motion for summary judgment, a court must view the facts, and any inferences drawn from these facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. A fact is material when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party is entitled to have its version of all that is disputed accepted, to have all reasonable inferences construed in its favor, to have all factual conflicts resolved in its favor, and to have the benefit of all favorable legal theories invoked by the evidence. *Kohl's Dept. Stores, Inc. v. Target Stores, Inc.*, 290 F.Supp.2d 674, 678 (E.D.Va.2003). The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without sufficient evidence to sustain his burden of proof on that point. *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548. These precepts and stan-

dards govern the resolution of the Defendants' motions.[27]

## II. The City Of Richmond

Count I, the only count remaining against the City after the Fed.R.Civ.P. 12(b)(6) stage, is a Section 1983 claim alleging a violation of the Eighth Amendment to the United States Constitution. In pertinent part, that statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. Section 1983 is not itself a source of substantive rights; rather, it provides a method for vindicating federal rights elsewhere conferred. *Westmoreland v. Brown*, 883 F.Supp. 67, 71 (E.D.Va.1995). To establish liability under Section 1983, a plaintiff must show that the defendant, acting under color of law, violated the plaintiff's federal constitutional or federal statutory rights, and thereby caused the complained of injury. *Coppage v. Mann*, 906 F.Supp. 1025, 1035 (E.D.Va. 1995). The gravamen of Count I is that the City subjected Stevenson to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, made applicable to state and municipal actors by operation of the Fourteenth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 101, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

---

**27.** The Court has jurisdiction over the claims based on Virginia law pursuant to the supplemental jurisdiction statute, 28 U.S.C. § 1367(a). In exercising supplemental jurisdiction over the state law claims, the Court, of course, must apply Virginia's substantive law. *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416 n. 7 (4th Cir.1992); *Rambus, Inc. v. Infineon Tech. AG*, 304 F.Supp.2d 812, 817 n. 8 (E.D.Va.2004).

Although cities are "person[s]" amenable to suit under Section 1983, municipal liability may not be predicated upon a theory of vicarious liability or respondeat superior. *Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, under *Monell*, municipal liability under Section 1983 arises only where the municipality, *qua municipality*, has undertaken an official policy or custom which causes a deprivation of the plaintiff's constitutional or statutory rights. *Id.; see also Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987); *Donaggio v. Arlington County*, 880 F.Supp. 446, 461 (E.D.Va.1995). Thus, in order to survive the City's motion for summary judgment as to Count I, Brown must set forth a sufficient factual basis to support a finding that: (1) the City had a policy or custom of deliberate indifference to the deprivation of the constitutional right alleged to have been violated; and (2) this policy or custom caused, or contributed to cause, the complained of injury. *Westmoreland*, 883 F.Supp. at 76 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)); *see also Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). These two elements are now addressed in turn.

### (A) Custom or Policy

Respecting the official custom or policy requirement of *Monell*, Brown alleges that the City has an official policy or custom of maintaining an overcrowded, unsanitary,[28] and poorly ventilated local jail. FAC, at 15 ¶ 74. Although it is perhaps conceptually awkward to argue that the City has an official policy or custom of maintaining the Jail in the alleged state, it is fair to read the FAC as, at least, alleging knowing and deliberate inaction on behalf of the City, the consequence of which was a deliberate choice to maintain the Jail in an overcrowded, structurally infirm, and poorly ventilated state that offended the Eighth Amendment. And, as recognized by the United States Court of Appeals for the Fourth Circuit, municipal inaction may, in certain circumstances, qualify as an official policy or custom for purposes of *Monell*. *Milligan v. City of Newport News*, 743 F.2d 227, 229–31 (4th Cir.1984).[29] Thus, in order to survive summary judgment respecting the official policy or custom requirement as to Count I, Brown must show that the City had knowledge of unconstitutional conditions at the Jail and yet took no action in response, thereby evincing a custom or policy of deliberate indifference. *Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir.1991).[30]

**28.** As explained *infra, see* Discussion Section III(A), Brown has not raised a triable issue of fact that the Jail was unsanitary in July and August 2001. Thus, to the extent Count I alleges that the City exhibited deliberate indifference to unsanitary conditions at the Jail, summary judgment will be entered in the City's favor.

**29.** In *Milligan*, the Fourth Circuit stated that there are two ways in which municipal inaction will constitute a custom or policy for purposes of *Monell*: (1) when the city fails to act despite a known pattern of constitutional deprivations; or (2) when the city fails to remedy a situation that, unaddressed, is patently likely to cause constitutional deprivations to an identifiable group of persons who stand in a special relationship to the city. *Milligan*, 743 F.2d at 229–30. Municipal liability, however, may not be rested simply upon a failure to adopt policies that, in retrospect, can be seen to be a means by which a particular constitutional or statutory deprivation might have been averted. *Id.* at 230.

**30.** In the March 9 Opinion, the Court rejected the City's argument that, because Brown can point only to one incident of meningitis transmission at the Jail, she, as a matter of law, cannot establish an official policy or custom of deliberate indifference. *Brown*, 308 F.Supp.2d at 693–94. In the interest of brevity, that explanation will not be repeated here.

To establish the existence of a triable issue of fact respecting such a custom or policy of deliberate indifference on the part of the City, Brown relies, in large part, on the deposition testimony of the City Manager. To begin, Brown points out that Dr. Jamison has admitted that the Jail is overcrowded, and that it has been so since at least the inception of his tenure as City Manager in 1998. Jamison Depo., Feb. 19, 2004, at 26. Dr. Jamison testified that, although he has long understood that there is a need to reduce the overcrowding at the Jail and remedy the facility's structural defects, the City is unwilling to fund any capital projects to achieve such results. *Id.* at 13. Instead, Dr. Jamison explained that his office has been, since at least the beginning of his tenure, exploring the feasibility of certain "alternatives" to the construction of a new jail or the expansion of the existing facility.[31]

Read as a whole, the clear import of Dr. Jamison's deposition testimony is that, notwithstanding a long-standing recognition of the Jail's serious overcrowding and structural problems, the City has not had the "political will" to institute any solutions. During deposition, Brown's lawyer asked Dr. Jamison why the City has long refused to remedy the problems at the Jail:

A: At the end of the day, the bottom line is that you have to have the resources to do it. . . . Then you have to say, am I willing to come forward and say to each and every taxpayer in the City of Richmond, we are going to increase your taxes. . . .

Q: So we can build a jail?

A: Right.

Q: Is there political will in the City of Richmond to do that?

A: I believe you can answer that yourself.[32]

Jamison Depo., Feb. 19, 2004, at 51–52. Throughout his deposition, however, Dr. Jamison displayed an understanding of the fact that the City has a duty, imposed by both the Federal Constitution and Virginia statutes, to provide inmates with a jail facility that is adequately ventilated and that is not severely overcrowded.[33]

Indeed, the City has offered no evidence that, in August 2001 (or, for that matter, anytime since 1988) the Jail was not severely overcrowded, poorly ventilated, and otherwise inadequate. Nor could the City offer such evidence given the three expert reports it commissioned in 1994, 1996, and 2001; reports that the City has simply ignored.

As noted, however, by the Supreme Court of the United States:

[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty

---

**31.** At no point in his deposition, however, did Dr. Jamison define with any precision the nature of these potentially feasible "alternatives" to building a new jail or funding capital improvements to the existing facility.

**32.** The record leaves no doubt that the only way to interpret Dr. Jamison's answer is: "No."

**33.** Brown also offers the deposition testimony of Johnson, the current Deputy City Manager.

During his deposition, Johnson testified that he understands that the Jail has long been operating at above its capacity. Johnson Depo., March 17, 2004, at 28. Johnson also testified that he has engaged in conversations with Mitchell respecting the Jail during which she informed him that the Jail's structure is out-dated, inadequate, and sorely in need of repair. *Id.* at 58. Johnson, however, testified that the City has no plans to build a new facility or for any large capital improvement projects respecting the City's jail system.

that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Thus, under the relevant decisional law, when the conditions at a jail deprive inmates of one or more basic human needs, the Eighth Amendment is violated. *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Strickler v. Waters*, 989 F.2d 1375, 1382 (4th Cir.1993); *Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir.1991).

Of course, a "basic human need" that must be provided is the need for "reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998. And, under the decisional law, this basic human need for "reasonable safety" prohibits the housing of inmates in situations patently likely to lead to the spread of illness, sickness, and communicable disease. *Helling*, 509 U.S. at 33, 113 S.Ct. 2475; *see also Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (stating that it is "cruel and unusual punishment to hold convicted criminals in unsafe conditions"); *Hutto v. Finney*, 437 U.S. 678, 682, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). In addition, the basic human needs mandated by the Eighth Amendment include inmates' need for a reasonable amount of space and their need for reasonable temperatures. *Williams*, 952 F.2d at 826.

Here, a reasonable jury could, on the basis of the record established herein, conclude that the overcrowded, poorly ventilated, and dilapidated conditions at the Jail deprived inmates of one or more of those basic human needs. In particular, the jury reasonably could conclude that Stevenson was deprived of the need to be free from conditions likely to result in the spread of infectious disease.

Moreover, under the Eighth Amendment, once the responsible officials become "aware of a problem with [jail] conditions, they cannot simply ignore the problem, but should take corrective action." *Williams*, 952 F.2d at 826; *see also Scarborough v. Austin*, No. 91–6754, 1992 WL 163916, *3–4 (4th Cir. July 16, 1992) (per curiam). In sum, on this record, a reasonable jury could find a pattern or practice for purposes of *Monell* by finding that the City Manager's Office, in its long-standing failure to act in the face of the known conditions at the Jail, acted with deliberate indifference to a known constitutional deprivation.

### (1) The Policymaker Issue

■ Of course, not every action or failure to act by every municipal official will subject a municipality to Section 1983 liability. Stated simply, not every individual on a municipality's payroll is capable of creating a custom or policy under *Monell*. Rather, municipal liability attaches only where the particular municipal actor possesses the final authority to establish official policy with respect to the topic at issue. *Knight v. Vernon*, 214 F.3d 544, 552 (4th Cir.2000).[34]

---

**34.** The City did not assert in its motion for summary judgment that its City Manager does not qualify as a final policymaker as respects the custom and policy herein at issue. Hence, that failure would have sufficed as grounds to resolve this point against the City and thereupon to have treated the City Manager as the final policymaker for purposes of this suit. Considering, however, the import of such a finding, the Court called for briefing on that issue and now will ascertain what the record shows on the point.

In order to hold the City liable under Section 1983 for the City Manager's actions or inactions, the Plaintiff must show that the City Manager possessed and exercised "final policymaking authority" respecting the City's authority to remedy the conditions of overcrowding, structural infirmities, and poor ventilation at the Jail. *Riddick v. Sch. Bd. of the City of Portsmouth*, 238 F.3d 518, 523 (4th Cir.2000); *Dotson v. Chester*, 937 F.2d 920, 924 (4th Cir.1991). Identification of the person or entity who possesses final policymaking authority is a question of law rather than fact and thus should be resolved by the Court before trial. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 729 (4th Cir. 1999). Moreover, resolution of the final policymaking authority issue is a question of *state* law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion); *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir.1994). Thus, in determining which local official possesses final policymaking authority for the allegedly unconstitutional action in question, it is necessary to look to the relevant state and local legal materials, including state and local positive law, as well as state or local " 'custom or usage having the force of law.' " *Riddick*, 238 F.3d at 523 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).[35]

To qualify as a final policymaking official, an official must have the responsibility and authority to "implement the *final* municipal policy with respect to a particular course of action." *Riddick*, 238 F.3d at 523 (emphasis in original). This is also true in a case such as this involving inaction or acquiescence. *Id.* Here, the City Manager simply does not possess the relevant final policymaking authority.

As discussed at length in the March 9 Opinion, the construction, renovation, and the structural maintenance of local jails in Virginia are, under the Code of Virginia, the responsibilities of local governments—in this case, the City. *Brown*, 308 F.Supp.2d at 698–701. The Code of Virginia, however, does not further define what individuals within the various local governments are to exercise final decisionmaking policy respecting local jails. Local positive law, however, specifically Section 4–02 of the Richmond City Charter (the "City Charter"), states that all powers vested generally in the City, unless otherwise specified, shall be exercised by the City Council, Richmond's local legislative body. Further, under Section 6–19 of the City Charter, the final authority to adopt a budget for any capital improvements, including the building of a new jail or structural improvements to an existing jail facility, also resides with the City Council.

The decisional law, of course, is that final policymaking authority, depending on the controlling state or local law, can be shared between several individuals or entities; similarly, final policymaking authority can be delegated from the actual policymaking authority to a lower-level entity or individual. *Riddick*, 238 F.3d at 523. Here, the City Charter establishes that the City Manager has the responsibility for drafting, annually, a list of proposed capital improvement projects for the ensuing

---

**35.** In resolving the final policymaking question, caution must be taken not to confuse the ability to make final implementing *decisions* with the ability to make final municipal *policy*. *Robinson v. Balog*, 160 F.3d 183, 190 (4th Cir.1998). Thus, even if a municipal employee makes final decisions and exercises discretion in conducting his job, that employee does not constitute a final policymaker if he is merely acting within the parameters set by others occupying a higher position within the municipality. *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir.1995).

fiscal year and an attendant budget, along "with his/her recommendations as to the means of financing the improvements proposed." City Charter, § 6–19. In other words, Section 6–19 dictates that the City Manager is to advise the City Council on the City's financial matters and to prepare a draft budget in which he or she is to account for any needed capital projects. Moreover, the City Charter states that the City Manager is to bring any perceived problems or issues facing the City to the City Council.

Notably, the paradigm set forth in the City Charter is reflected in the deposition testimony from this case. During deposition, Dr. Jamison and Brown's counsel had the following exchange:

Q: What would be the procedures, as far as you know to get a new jail approved? Who would be a final decision maker on behalf of the City to approve a new jail?

A: At the end of the day, the vote would have to come from City Council.

Q: [But] who makes the recommendations to City Council for such things as say a new jail?

A: That would come from the City Manager.

Jamison Depo., Feb. 19, 2004, at 19. Later in the deposition, Brown's counsel returned to the topic:

Q: And policy issues, where would that fall, policy issues for the Richmond City Jail?

A: Policy issues at the end of the day are going to be Council issues ....

Q: But you're the designee though for matters that come before the Council; is that not right?

A: Correct.

*Id.* at 81. Pointing to the fact that, under the City Charter, impetus for any capital improvements or budgetary projects, such as those that might have remedied the Jail's allegedly unconstitutional infirmities, stem originally from the City Manager's Office, Brown argues that the City Manager constitutes the final decisionmaking authority as to the authority here at issue.

That argument, however, is not correct. In the time leading up to Stevenson's death, the City Manager, under the City Charter, certainly possessed the ability to include a proposal for a new jail or for capital improvements to the existing facility in his budget recommendations. Similarly, the City Manager had the duty to advise the City Council on the financial needs of the City and to make any other recommendations that he saw fit, *see* City Charter, § 5–05, and, in this capacity, arguably possessed a responsibility to advise the City Council to remedy the situation at the Jail. The discretion inherent in the City Manager's job, however, does not equate to final decisionmaking authority. *Riddick*, 238 F.3d at 523. Rather, at least as respects capital improvements and the municipality's budget, the City Manager's role is one of advisor and recommender. Stated another way, although Dr. Jamison certainly influences greatly the topics that come before the City Council, the ability to adopt final decisions on topics relevant to this suit does not reside in his office.

Pursuant to Section 6–10 of the City Charter, after the City Manager submits a draft budget, the City Council may increase, decrease, or strike out items of expenditure in the proposed budget. And, perhaps more importantly for the present discussion, the City Council may insert completely new items of expenditure that did not appear in the City Manager's draft submission. City Charter, § 6–10. In other words, the City Council is not bound by the draft budget submitted by the City Manager's office; rather, the local legislative body has the power and responsibility to alter the proposal as it sees fit.

Thus, if the City Manager had recommended capital improvements to the Jail

or the building of a new facility, the City Council would have been in no way bound to adopt any such recommendation. And, on a related piece, considering that the City Council itself possesses the ability and the duty to insert any needed expenditures into the City's budget completely apart from the City Manager's recommendations, the fact that the City Manager failed to make any such recommendation does not absolve the City of potential fault.

Likewise, if the City Manager had, in his capacity as advisor to the City Council, *see* City Charter, § 5–05, recommended a course of action respecting the physical structure and capacity of the Jail, the City Council would not have been obligated to accept or act upon such advice. And, although the City Charter requires the City Manager to lodge with the City Council "such recommendations as may seem to him ... desirable", *id.*, the City Charter in no way suggests that the local legislature's only source of ideas or impetus is the City Manager.

In sum, therefore, at least as respects capital improvements and the Jail, as a matter of local law, although the City Manager certainly has the duty to advise and to make recommendations, Dr. Jamison's office is not the repository of final policymaking authority. *Riddick*, 238 F.3d at 523–24. Rather, the City Charter vests that role in the City Council. As a matter of law, the Court holds that, as respects Brown's Section 1983 suit against the City, the City Council constitutes the final policymaking entity.

■ That holding, however, is not fatal to Brown's Section 1983 case against the City because the record contains substantial evidence that, when construed in the light most favorable to the nonmoving party, would permit the jury to conclude that the City Council itself had knowledge of the conditions at the Jail and engaged in an official policy or custom of inaction towards the Jail in the period leading up to Stevenson's death. Pls. Reply Mem. Regarding Final Policymaker, May 26, 2004, at 3. And, because the City Council constitutes the final policymaking authority respecting the Jail, this evidence is sufficient for purposes of summary judgment and the *Monell* "custom or policy" requirement.

For example, Dr. Jamison testified that, throughout his tenure as City Manager, he repeatedly discussed the problems at the Jail and several proposed solutions with the en banc City Council. Jamison Depo., Feb. 19, 2004, at 47. In fact, under the City Charter, it was his duty to pass along Mitchell's points respecting the Jail to the City Council and otherwise to bring the problems at the Jail to the City Council's attention. It cannot be presumed that the City Manager did not perform his duty to do those things. And, to its credit, the City does not argue otherwise.

Further, Deputy City Manager Johnson testified respecting several meetings he has had with individual members of the City Council regarding the need to correct conditions at the Jail. Johnson Depo., March 17, 2004, at 44. In other words, Johnson testified that, throughout his tenure as deputy, he has discussed the Jail's problems and several possible solutions with City Council members.

Mitchell too has offered testimony relevant to this topic. She stated:

[D]uring budget time, we prepare a budget document. And, this is something that my office will compile. And, it's basically a book. It outlines our major issues, what our challenges are and what we feel would remedy those challenges. And we present that during our budget time. And, I've also ensured that during budget time, *we also make those documents available to the members of City Council.*

Mitchell Depo., Feb. 19, 2004, at 58 (emphasis added). Among the topics that Mitchell addressed in the budget process was the need for a new, or expanded, jail to alleviate severe overcrowding, as well as the need to remedy the temperature problems at the Jail. Mitchell also discussed these needs with Dr. Jamison and Johnson for the purpose of getting them before the City Council. And, from the testimony of Dr. Jamison and Johnson, it is obvious that these topics were presented to the City Counsel en banc and to its members individually.

Also, the City Council authorized, and funded, the 1994 CBCP study, and the 1996 addendum thereto, as well as the study that led to the 2001 CBCP. Further, to implement part of the 1994 CBCP and the 1996 addendum thereto, the City Council actually earmarked funds for corrective work at the Jail but then, in 1997, designated those same funds for other uses. One cannot presume that the City Council made the original allocation of funds without being aware of the conditions sought to be remedied by the allocation. Nor can it be presumed that the City Council was unmindful of its purpose for making the original allocation when it redesignated the use of those funds in 1997. Brown also is entitled to the inference that the members of the City Council have noted these CBCP reports and understood their content. As mentioned, the several CBCP reports documented that the Jail suffered from overcrowding, was in general disrepair, and was incapable of housing properly the City's inmate population.

Finally, by the late 1990s, the conditions at the Jail appear to have been a matter of public knowledge. During her deposition, Mitchell noted that two local papers, the Richmond Times–Dispatch (the "Times–Dispatch") and the Richmond Free Press (the "Free Press"), had, throughout the late 1990s and early 2000s, run various stories respecting the conditions at the Jail, particularly the gross overpopulation and the problems associated therewith. For instance, Mitchell recounted that the Times–Dispatch produced several articles respecting the 1999 staphylococci infection at the Jail. Mitchell Depo., Feb. 19, 2004, at 108. Mitchell also testified respecting a 2000 article in the Free Press headlined "Sheriff Lobbies to Eliminate Jail Overcrowding," in which the paper recounted the Jail's structural and population problems. Id. at 115. A reasonable jury could conclude that members of City Council were aware of the conditions at the Jail as prominently reported in these two local newspapers. Indeed, it is compelling that the City does not even argue that the City Council was not fully aware of the deplorable conditions at the Jail.

Taken as a whole, the record would permit a reasonable jury to find that the City Council, and hence the City, was aware of the long history of overcrowding, poor ventilation, and structural defects at the Jail and the risks that those conditions posed, including the risk of spreading infectious disease. Moreover, a jury could conclude that the Jail's conditions violated established federal constitutional rights. And, the record clearly would permit a reasonable jury to conclude that the well-established custom and policy of the City was to be deliberately indifferent to the rights allegedly violated.[36]

36. The City notes that the guidelines that govern the standards for jails and prisons in the Commonwealth are set by the Board of Corrections and thereafter enforced by the Department of Corrections. See Va.Code Ann. § 53.1–68 et seq. The City further notes that the Department of Corrections conducted unannounced inspections of the Jail in 1999, 2000, and 2001 and in all instances found the Jail to be in compliance with the applicable standards. The City further notes that, al-

## (B) Causation

■ Offering sufficient proof to support a finding of an official policy or custom, however, is not the only hurdle that Brown faces in surviving summary judgment respecting Count I. In addition to meeting the policy or custom requirement of *Monell*, a Section 1983 plaintiff seeking to establish municipal liability also must show a causal nexus between the municipality's custom or policy and the complained of injury. *Monell*, 436 U.S. at 658, 98 S.Ct. 2018; *Gordon v. Kidd*, 971 F.2d 1087, 1097 (4th Cir.1992). Specifically, at the summary judgment stage, a Section 1983 plaintiff must offer sufficient evidence to support a finding that an "affirmative causal link" exists between the alleged custom or policy and the complained of injury. *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999).

Here, the City maintains that Brown has failed to raise a triable issue of fact respecting a causal connection between the conditions at the Jail and Stevenson's contraction of, and subsequent death from, bacterial meningitis. The City's argument is predicated principally on the undisputed facts that an individual may be colonized with bacterial meningitis for several years before succumbing to illness and that the acute onset of meningitis illness can occur spontaneously without regard to external factors. The City, referencing these facts, argues that Stevenson could have been colonized with bacterial meningitis either before or after he was incarcerated and could have succumbed to actual illness spontaneously and without regard to the Jail's conditions.[37]

Specifically, the City notes that the Plaintiff's expert, Dr. Barry Farr ("Dr. Farr"), himself admitted at deposition that an individual may be colonized with bacterial meningitis for several years before becoming ill.[38] Moreover, Dr. Farr has conceded that an individual can progress from mere colonization with meningitis bacteria to acute illness spontaneously, that is, without regard to any external or other factors (*e.g.*, excessive heat, overcrowded conditions, or a preceding illness such as influenza). Pointing to these statements of Dr. Farr, the City posits that it is

though the Board of Corrections has the power to move prisoners from a noncomplaint jail to a compliant one, *see* Va.Code Ann. § 53.1–69, it has never done so as to the Jail. The City, therefore, argues that the actions and inactions of the Board of Corrections and the Department of Corrections establish that the City acted appropriately and therefore did not have an official policy or custom of deliberate indifference towards the Jail. The Department of Corrections and the Board of Corrections, however, are not the only entities that can determine whether or not the City's actions and inactions pass constitutional muster. Indeed, through Section 1983, Congress created a vehicle for plaintiffs to bring such grievances before the federal courts, thereby bypassing state-level entities which may be shirking their duties under the Constitution. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). What the Board of Corrections or the Department of Corrections may or may not think of the City's actions or inactions or the situation at the Jail, there-fore, is simply not dispositive of this Section 1983 suit.

**37.** By Order entered on May 24, 2004, the Court, finding the proffered testimony inadmissible under Fed.R.Evid. 702, as well as *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny, struck, pursuant to a motion *in limine* filed by the Plaintiff, the testimony of the City's medical expert, Dr. Allan Joseph Morrison. The City, therefore, is unable to rely on its submitted expert reports and declarations in this summary judgment motion. The City, of course, can rely on the rest of the record and on statements contained in Brown's expert's various reports and affidavits.

**38.** Indeed, it is undisputed that a not insignificant percentage of individuals colonized with bacterial meningitis never manifest *any* signs of illness.

impossible to say within a reasonable degree of medical certainty that Stevenson became colonized while in custody or that the onset of his illness was caused by the conditions at the Jail.

The City's argument, however, ignores the true import of Dr. Farr's opinions. Although he admits that, due to the pathology of bacterial meningitis, one cannot be absolutely sure that Stevenson was not colonized with the fatal bacteria prior to his incarceration, Dr. Farr has testified, relying on published and peer-reviewed studies and data, that the great majority of individuals who manifest illness as a result of colonization with bacterial meningitis do so shortly after exposure to the bacteria. Farr Depo., March 16, 2004, at 17, 34. Indeed, Dr. Farr has opined, based on his review of published studies and data, that the majority of individuals who become ill as a result of bacterial meningitis colonization do so within ten to fourteen days after colonization. And, taking into account Stevenson's condition at the time of incarceration and thereafter and considering that Stevenson had been incarcerated in excess of two weeks at the point that he began to manifest symptoms of the illness, Dr. Farr concludes, to a reasonable degree of medical certainty, that Stevenson was exposed to the infecting strain of bacteria subsequent to his entering into the Jail.

Likewise, Dr. Farr has opined, to a reasonable degree of medical certainty, that the conditions at the Jail—in particular the gross overcrowding and poor ventilation present there—were major contributing factors in Stevenson's contraction of bacterial meningitis and his subsequent man-ifestation of the illness that caused his death. Farr Depo., March 16, 2004, at 30, 53. To this end, referencing various published studies and texts, Dr. Farr notes that overcrowded and poorly ventilated situations are common areas in which bacterial meningitis can easily spread. He further notes that external conditions such as overcrowding and insufficient ventilation are classic textbook examples of factors likely to cause a person colonized with bacterial meningitis to succumb to illness. Thus, Dr. Farr opines, to a reasonable degree of medical certainty, that the overcrowded and poorly ventilated conditions at the Jail caused or contributed to cause Stevenson's contraction of bacterial meningitis and the subsequent onset of the acute illness.

Through the testimony of Dr. Farr and the record respecting conditions at the Jail, the Plaintiff has raised a triable issue of fact respecting whether the asserted official custom or policy of the City of ignoring the grossly overcrowded and poorly ventilated conditions at the Jail caused or contributed to cause Stevenson's illness and death. Thus, Brown has offered sufficient evidence to survive summary judgment on the requisite causal element of her Section 1983 case against the City. *Carter*, 164 F.3d at 221.

█ In sum, therefore, Brown has raised triable issues of fact respecting whether the City had an official policy or custom of deliberate indifference towards the known problems at the Jail and whether this custom or policy caused or contributed to cause Stevenson's death. The City's motion for summary judgment respecting Count I, therefore, will be denied.[39]

---

**39.** The City further argues that, even if it had a policy or custom of deliberate indifference respecting the problems at the Jail, and this policy or custom was a causal factor in Stevenson's death, the actions of Mitchell and Dr. Freund constitute superceding causes that negate the imposition of liability on the City.

The Plaintiff, on the other hand, contends that the City's official custom or policy was a concurrent cause of Stevenson's death and, therefore, that the City is liable despite the fault of the other defendants. The issue of superceding versus concurrent causes, of course, is a quintessential question of fact,

## III. Sheriff Mitchell

 Brown's FAC asserts three claims against Mitchell, two under 42 U.S.C. § 1983 (Counts I and II) and one under Virginia state law (Count V).[40] Mitchell appears to have moved for summary judgment on all three counts. Mitchell's motion for summary judgment, however, is a model of generalized assertion, unsupported by legal citation. For that reason, and because of the stream of consciousness style employed in the memorandum supporting the motion, it is difficult to identify Mitchell's contentions or to analyze them.

Indeed, the motion for summary judgment is structured without reference to any specific count, instead purporting to seek summary judgment on general topics. This unorthodox approach perhaps would warrant summary denial of the motion for summary judgment because it is not the responsibility of the Court to ferret out, from a brief, the legal contentions of the moving party and then to find legal and evidentiary support for them. Likewise, it is not the responsibility of the nonmoving party to engage in a similar exercise in rebutting a motion for summary judgment. Rather, as is elementary in summary judg-

ment jurisprudence, that is the responsibility of the moving party, here Mitchell. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

For instance, in her papers, Mitchell argues that the record contains an insufficient factual basis for certain of Brown's claims. Although a party obviously may base its request for summary judgment on a lack of proof in the record as to a particular claim, the moving party must first demonstrate an absence of proof on that claim. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Moreover, it is settled beyond peradventure that the moving party must demonstrate, by citing legal authority, that the law supports its request for summary judgment.

Mitchell's motion for summary judgment violates these fundamental precepts. Upon close and generous examination, however, the Court finds that Mitchell's papers permit the identification of issues as outlined below. Thus, notwithstanding Mitchell's unorthodox and unacceptable style and the difficulty that it has presented, the Court is obligated to undertake a reasonable and fair construction of her

---

*Cohen v. Boxberger*, 544 F.2d 701, 704 (4th Cir.1976), and will therefore be left for resolution by the jury.

40. In the March 9 Opinion, the Court, after analyzing Virginia's statutory scheme for the operation of local correctional facilities, held that, respecting Counts I and V, Mitchell cannot be held liable for the alleged structural or design problems at the Jail. *Brown*, 308 F.Supp.2d at 699. Thus, for instance, under Virginia's statutory scheme, the Sheriff cannot be liable for the Jail's allegedly insufficient number of toilets and showers. Likewise, Mitchell cannot be liable for the alleged ventilation problems because ventilation, at least as alleged by Brown, implicates the structure and design of the Jail's ventilation system, rather than its cleaning and day to day maintenance. The Sheriff, however, as the "keeper of the Jail," is responsible for the

"day to day maintenance" and operation of the facility. *Id.* at 698 (discussing Va.Code Ann. § 53.1–116 *et seq.*). Thus, to the extent that Brown's Complaint contains allegations such as the dirty state of the toilet facilities and that human excrement is often found in the showers, the Court found, respecting Counts I and V, that it states proper claims against Mitchell. 308 F.Supp.2d at 699; *see also* Va.Code Ann. § 15.2–1609 (charging Virginia sheriffs "with the custody, feeding and care of all prisoners confined in the county or city jail"). The Court also held that, to the extent Counts I and V allege that Mitchell maintained an overcrowded Jail, they aver proper claims against the Sheriff. 308 F.Supp.2d at 701. Finally, respecting Count II, as keeper of the Jail, Mitchell is responsible for the proper training and supervision of the deputy guards who work there.

contentions as best that they can be grasped.[41]

### (A) The Motion for Summary Judgment, as Mitchell Puts it, for "Claims Based on Maintenance and Cleaning" at the Jail

As mentioned, in moving for summary judgment, Mitchell has not, to any real extent, engaged in an individualized analysis of the three separate claims pending against her. Rather, she has sought summary judgment on broad topics and areas.

Thus, under the heading "No Claim Based on Maintenance and Cleaning," Mitchell makes the following assertion—and only the following assertion—as the basis for summary judgment on the topic quoted:

> The plaintiff cannot show that Sheriff Mitchell allowed the jail to be unsanitary or poorly maintained, or that she is deliberately indifferent to maintenance and cleaning at the jail. She has implemented programs to clean the jail every day. She has created inmate and deputy work crews who perform most of the repairs at the jail. Her deputies check the jail daily for needed repairs and for cleanliness. When they cannot make a repair, they call upon the City to accomplish the task.

Def. Mitchell Mem. in Supp. of Renewed Mot. for Summ. J., March 30, 2004, at 15 (hereinafter "Mitchell's Mem., at ___"). Mitchell's entire claim for summary judgment on this score contains not one citation to the record or any citation of legal authority whatsoever. Thus, Mitchell's memorandum largely leaves the Court to guess at what is intended as the basis for her motion.

In engaging in this unwelcome task, the Court first notes that, in positing the allegedly "undisputed" facts pursuant to Local Civil Rule 56, Mitchell has asserted six numbered paragraphs (paragraphs fifteen through nineteen) under the heading "Day–to–Day Maintenance and Cleaning of the Jail." Mitchell's Mem., at 5–6. At the end of each of those six paragraphs, there is a citation to one of two affidavits.[42] Presumably, this is the citation to the record on which Mitchell relies to support her truncated assertion, contained in one paragraph on page fifteen of her memorandum, that Brown has failed to raise a triable issue of fact that Mitchell maintained an unsanitary Jail facility. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.") (quoting Fed. R.Civ.P. 56(c)).

In response to Mitchell's argument that the record contains no triable issue of fact that the Sheriff maintained an unsanitary Jail, Brown relies on the deposition testimony of Mitchell herself, Winston's 1988 Bill of Complaint and testimony taken in that case, and statements of her prison-conditions expert, Dr. Alvin W. Cohn ("Dr. Cohn"). These pieces of evidence, however, even when considered *in toto* and in the light most favorable to Brown, do not raise a triable issue of fact that the Jail was unsanitary or that Mitchell maintained the Jail in an unclean state.

---

**41.** That being said, Mitchell is not proceeding in this case *pro se* and thus she will not be accorded the leniency extended to those who, by virtue of indigency, proceed without counsel.

**42.** One of these affidavits is offered by Mitchell herself; the other is offered by Christopher Uzel, a deputy sheriff under Mitchell.

Brown correctly notes that Mitchell has made statements respecting sanitation issues at the Jail. At deposition, Mitchell testified generally respecting sanitation issues at the Jail:

> [W]hen you're dealing with overcrowding conditions it is very, very hard and a challenge to maintain a sanitary facility because, basically, you know, where most jails may clean up three times a day, we're doing it all day long, basically. And, that is quite a challenge because our facility is quite large. So, we spend a lot of staff time and a lot of inmate resources trying to make sure that the jail is maintained in a sanitary manner.

Mitchell Depo., Feb. 19, 2004, at 40. By way of a particular example, Mitchell testified respecting the inmate showers: "[K]eeping them clean is a challenge. It's not like they all get up in the morning and take their showers at the same time. The showers ... are in constant use." *Id.* at 43. Mitchell made similar statements respecting other facilities at the Jail, including the bathrooms and kitchen.

The probative effect of Mitchell's testimony, however, contrary to Brown's contentions, is not that the Jail is unsanitary, but rather that Mitchell and her staff struggle to keep the facility in a sanitary condition. In other words, even construed in the light most favorable to the Plaintiff, Mitchell's testimony does not support a finding that the Jail was unsanitary or unclean in August 2001, but rather that Mitchell's staff and the Jail's inmates are required to work long and hard to maintain sanitary conditions at the Jail. In sum, although Brown is correct that Mitchell herself has testified that "there is a constant struggle to keep the [Jail] clean," Pls. Suppl. Mem. in Resp. to Mitchell's Mot. for Summ. J., April 19, 2004 at 14, Brown's contention that Mitchell's testimony raises a triable issue of fact that the Jail was actually unsanitary in summer 2001 is simply erroneous.[43]

■ Brown further points to Winston's 1988 Bill of Complaint, which does indeed contain allegations of unsanitary conditions at the Jail.[44] Brown further points to testimony given by Ward Duel ("Duel"), an expert who testified in relation to Winston's 1988 case. Both Winston in his Bill of Complaint and Duel in his testimony in Winston's case made repeated references to unsanitary conditions at the Jail. Those statements, however, were made twelve years before Stevenson's incarceration and death. Although these statements certainly raise a triable issue of fact respecting the Jail's unsanitary conditions in 1988— and indeed may provide some marginally probative evidence of the Jail's condition in 2001—due to their vintage they are not sufficient to create a triable issue of fact that the Jail was unsanitary in summer 2001. This is especially true when one

---

**43.** At deposition, Mitchell testified that, on occasion, "the waste water from the kitchen ... gets mixed in with the waste water that comes from the back of the [J]ail and it clogs up the pipes which means that sewage comes up through the drain holes ... in our basement." Mitchell Depo., Feb. 19, 2004, at 23. Mitchell, however, further testified that she took all efforts to clean up such situations. *Id.* Moreover, the Jail's basement is not used to house inmates but rather contains staff offices and storage; thus, even if there were sewage there such a fact would have no bearing on Brown's suit. Likewise, although Mitchell, in her 2001 Petition for Writ of Mandamus, admitted that the Lock–Up facility is infested with vermin (an obvious cleanliness/sanitation issue), the Lock–Up facility is not implicated in this action.

**44.** Although the statements in a Bill of Complaint are mere allegations and not evidence *per se*, because the statements in the 1988 pleading were made by Winston in his official capacity, they can be viewed as admissions of the Sheriff's Office. Thus, but for their vintage, the allegations would be proper for the purpose offered by Brown.

considers that different individuals occupied the chief position at the Jail in 1988 and 2001.

Finally, in an effort to raise a triable issue of fact respecting unsanitary conditions, the Plaintiff points to the sworn statements of Dr. Cohn, who has asserted that Mitchell keeps the Jail in an unsanitary condition. Affidavit of Cohn, at 5 ¶ 23. Dr. Cohn, however, does not base this contention on his personal knowledge; rather, Dr. Cohn bases this opinion on his review of Winston's 1988 Bill of Complaint, Duel's testimony in that case, and other materials from Winston's suit. Considering that those materials are not themselves capable of raising a triable issue of fact respecting the Jail's sanitary conditions in 2001, Dr. Cohn's opinion based upon those materials certainly is not either.[45]

For these reasons, the Court finds that Brown has failed to raise a triable issue of fact that the Jail was "unsanitary," as Brown's FAC utilizes that term, at the time of Stevenson's illness and death or that Mitchell maintained an unclean facility.[46] Thus, the task now becomes to ascertain which of the three counts against the Sheriff implicate these issues.

Count I of the FAC, brought pursuant to 42 U.S.C. § 1983, is based in part upon an assertion that Mitchell had an official policy or custom of maintaining the Jail in an unsanitary condition. Also, Count V, a state law wrongful death claim, asserts that Mitchell was grossly negligent in maintaining the Jail in, *inter alia,* an unsanitary condition. Thus, to the extent that Counts I and V are based on the theory that unsanitary conditions caused Stevenson's death, Mitchell is entitled to partial summary judgment on those counts.[47] In sum, to the extent that Counts I and V attempt to show deliberate indifference and gross negligence respectively based upon the Sheriff's keeping of an unsanitary and unclean facility, Mitchell's motion for summary judgment respecting those counts will be granted.[48]

---

45. The Court recognizes that Dr. Cohn toured the Jail in March 2004, and, through this tour, gained personal knowledge of the Jail's conditions. Nonetheless, although he testified in a subsequent deposition that he witnessed overcrowding, a lack of repair, and problems concerning the physical structure of the facility during this tour, he did not indicate that he observed any unsanitary conditions. Cohn Depo., March 8, 2004, at 6. Thus, even if one were to conclude that observations made by Dr. Cohn in 2004 are probative of the Jail's condition in 2001, the fact remains that Dr. Cohn has not testified that he personally witnessed unsanitary conditions (other than sanitary conditions of a structural nature, *Brown,* 308 F.Supp.2d at 697) during his recent Jail tour.

46. The record also contains photographs taken of the Jail in February 2004. Even, however, if photographs taken in 2004 could raise a triable issue of fact respecting the Jail's conditions in summer 2001, those photographs, although containing rather startling depictions of structural defects in the Jail facility, do not depict "unsanitary" conditions as that term is employed in the FAC. *Brown,* 308 F.Supp.2d at 697 (construing Complaint's use of term "unsanitary"). Those photographs, therefore, do not alter the correctness of the above outcome.

47. The other count pending against Mitchell, Count II, proceeds against the Sheriff under a failure to train theory. Sanitary and cleanliness issues play no role in that count.

48. Mitchell, again in a cursory fashion, further argues, in a heading styled "Claims Based on Maintenance and Unsanitary Conditions," that Brown has failed to raise a triable issue of fact regarding a causal link between any unsanitary conditions at the Jail and Stevenson's death. In light of the above ruling, it is unnecessary to reach this argument. Notably, however, in positing her causation argument, Mitchell states, as a factual proposition, that the transmission of bacterial meningitis is "solely a function of too many people being together," Mitchell's Mem., at 11, thereby conceding a causal link between

**(B) The Motion for Summary Judgment on, as Mitchell Puts it, "No Claim Based on Jail Overcrowding"**

■ On pages thirteen to fifteen of the memorandum filed in support of her renewed motion for summary judgment, Mitchell argues that she cannot be liable for the allegedly overcrowded conditions at the Jail. Unfortunately, as was true with the sanitation and cleanliness issue discussed above, this facet of Mitchell's motion also is not directed to any specific count pending against her. Nonetheless, the Court will undertake an analysis of Mitchell's arguments respecting overpopulation and the effect, if any, of those arguments on the allegations contained in Brown's FAC.

It is really beyond dispute that, from 1994 through 2001, the Jail was severely overcrowded, even dangerously so. Perhaps most pertinently for this suit, the 2001 CBCP issued in May 2001 reported gross overcrowding; and, according to affidavits filed in this matter, the overcrowding reported on in the May 2001 report continued throughout the ensuing summer and Stevenson's incarceration. *See* Affidavits of Miles, Peete, & Walker.

Nor is it disputed that Mitchell knew of this overcrowding for, at least, the seven years of her tenure as Sheriff before Stevenson's death, *i.e.*, 1994–2001. Indeed, under Va.Code Ann. § 53.1–122, Mitchell, as Sheriff, is required to know, and to keep records reflecting, the population of the Jail. Mitchell does not contend that she disobeyed that statutory mandate; it is reasonable to believe that, at all times since she assumed her current office, these records informed Mitchell of the Jail's overcrowded condition. Also, it is fairly inferable that Mitchell knew of the egregious overcrowding for the several years before 1994 when she held lower-ranking positions in Winston's office.

Moreover, Mitchell herself has testified to her actual knowledge of the overcrowded conditions at the Jail. And, quite pertinently for the pending Section 1983 count, there is evidence that Mitchell possessed a subjective understanding of the serious medical risk that this overcrowding presented. Specifically, in paragraph twenty of her 2001 Petition for Writ of Mandamus, Mitchell disclosed her subjective understanding that, throughout her tenure as Sheriff, the overcrowded conditions at the Jail have presented an unacceptably high risk of contagious diseases spreading throughout the Jail's inmate population. *Brown*, 308 F.Supp.2d at 689 (discussing Mitchell's 2001 Petition for Writ of Mandamus).

On this record, a triable issue of fact regarding serious, even dangerous, overcrowding at the Jail has been established; and, the record contains a triable issue of fact respecting Mitchell's knowledge thereof. Finally, as recounted in footnote 48, *supra*, Mitchell, through her papers on this motion, has conceded that overcrowding at the Jail played a causal role in Stevenson's death.

In light of this record, rather than challenging the fact of overcrowding, her knowledge thereof, or the causal nexus between overcrowding and Stevenson's death, it appears that Mitchell has predicated her motion for summary judgment on the overcrowding issue on the assertions that her actions or inactions did not cause the overcrowding and that she was not deliberately indifferent or grossly negligent to the constitutional violations. True, however, to the previously described unorthodox form, the memorandum supporting Mitchell's motion does not contain,

---

overcrowding at the Jail and Stevenson's death.

in the presentation of her rationale, a single citation to the record to support her theory or the conclusory assertion on which she bases it.

That being said, in the list of allegedly "undisputed" facts required by Local Civil Rule 56, under a heading entitled "The Richmond City Jail and Efforts to Improve It," Mitchell has presented a list of asserted facts with citation to affidavits that tend to parallel the conclusory assertion of her theory for summary judgment. In that section of her memorandum, Mitchell points to her efforts to persuade the City's administration to improve the conditions at the Jail, recounting her various communications with the City Manager's office and her submissions to City Council. Mitchell also relies on the several budget proposals she made to the City, in which she asked for a new, or expanded jail. She further notes that, in 2001 (albeit after Stevenson had died), she actually sued the City respecting the Jail's conditions. In addition, Mitchell correctly notes that, under Virginia's statutory scheme, she is herself, as Sheriff, unable to build a new jail or to expand physically or improve structurally the existing building. Citing these conversations, actions, and law, Mitchell contends that, by bringing the problem to the attention of various officials, she acted appropriately to alleviate the Jail's overcrowding and to prevent the problems associated therewith.[49]

With the state of the record and Mitchell's broad contentions in place, it is now appropriate to address these matters in the context of the actual claims pending against the Sheriff. Specifically, these matters must be considered in perspective of Count I and Count V.[50]

### (1) Count I: 42 U.S.C. § 1983

Count I proceeds under Section 1983 against Mitchell in her individual (as opposed to official) capacity.[51] In order to survive summary judgment respecting Count I, Brown must raise a triable issue of fact that: (1) Mitchell, at the time of Stevenson's death, had an official policy or custom of operating and maintaining the Jail in a way that resulted in overcrowded conditions; (2) that this official policy or custom indicates a deliberate indifference to Stevenson's Eighth Amendment rights; and (3) that this custom or policy caused, or contributed to cause, Stevenson's death. *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir.1987); *see also Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir.1991). As previously noted, Mitchell has admitted the third element of Brown's claim: that overcrowded conditions at the Jail caused, or contributed to cause, Stevenson's death.[52]

Here, Mitchell contends that she did not cause, or contribute to cause, the overcrowding at the Jail (the first element) and

---

**49.** The facts as recounted by Mitchell are not really disputed; indeed, Brown agrees that most, if not all, of the actions that Mitchell claims to have taken were, in fact, taken.

**50.** Count II, which, as mentioned, proceeds under a failure to train theory, is not implicated by the overcrowding issue.

**51.** *See generally Brown*, 308 F.Supp.2d at 696 n. 17 (comparing official capacity suits with individual capacity suits, citing, *inter alia*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

**52.** Says Mitchell:

> Unsanitary conditions did not cause the plaintiff to get bacterial meningitis. Rather, according to plaintiff's own expert, people get the disease because they are in close contact with others. Thus, the plaintiff's various claims about the jail being dirty and poorly ventilated are irrelevant. These conditions did not cause the plaintiff's illness; *the illness arose from transmission of germs by being close to too many people.*

Mitchell's Mem., at 12 (emphasis added).

that she was not deliberately indifferent to it (the second element). As noted, Mitchell, under the heading "The Richmond City Jail and Efforts to Improve It," asserts that she alerted the City to the constitutional violations and urged the City to remedy the situation. For these reasons and because she cannot by law actually build a new facility or improve structurally the existing one, Mitchell maintains that she neither caused, nor contributed to cause, the overcrowding nor was she deliberately indifferent to the known risk of serious injury or death of which she admittedly knew was presented by the condition.[53] Mitchell's recitation of facts and law, however, is only part of the relevant story respecting Mitchell's response to the overcrowding of the Jail and to the serious health risk posed by this overcrowding, of which risk Mitchell admittedly has long been aware.

In the March 9 Opinion, the Court recounted the uncontroversial proposition that Mitchell, whose elected position as Sheriff includes the operation of the Jail in accord with the dictates of Title 53 of the Code of Virginia, is charged with knowledge of the statutes and provisions contained therein. 308 F.Supp.2d at 701. Thus, she is presumed to know her statutory duties and to be aware of Title 53, which sets out the statutory scheme for establishing and operating Virginia prisons and other correctional facilities.

For instance, Mitchell is presumed to know that, under Va.Code Ann. § 53.1–74: "When a ... city is without an adequate jail ... the circuit court thereof shall adopt as its jail the jail of another county or city until it can obtain an adequate jail." And, she is presumed to know that, when a Virginia circuit court is informed by the sheriff or otherwise that the local jail in its jurisdiction is overcrowded or is otherwise unsuitable, that court "*shall adopt* as its jail the jail of another county or city until it can obtain an adequate jail." Va.Code Ann. § 53.1–74 (emphasis added). Furthermore, she is presumed to know that, under Va.Code Ann. § 53.1–71, when it appears to the local circuit court of a city that a local jail is inadequate to meet the jurisdiction's needs, it may order that city to make the local jail adequate. And, she is charged with knowledge that, by statute, prisoners under her control may be transferred from an overcrowded (or otherwise infirm) facility to one that is not. Va.Code Ann. § 53.1–69.

Now that discovery is complete, the record contains evidence that Mitchell, charged knowledge of Title 53 aside, actually knew of the remedies available to her under Virginia law. During deposition, Mitchell stated that, by 2000, she had come

---

**53.** With little explanation or analysis, Mitchell cites *Reid v. Kayye*, 885 F.2d 129 (4th Cir. 1989) (per curiam), for the proposition that she did not "cause" the overcrowding at the Jail. Mitchell, however, has an absolute duty, imposed by statute, to house safely the inmates at the Jail. *See* Va.Code Ann. § 15.2–1609 (mandating that sheriff "shall ... be charged with the custody ... and care of all prisoners confined in the ... city jail"). This case, therefore, is unlike *Reid*, in which the Fourth Circuit upheld a district court's decision that the Secretary of the North Carolina Department of Human Resources ("Secretary") was not liable under Section 1983 for conditions at a local jail. The North Carolina statute at issue in *Reid* states that the Secretary, upon making certain findings, "may" take certain corrective action. *Reid*, 885 F.2d at 131. The Fourth Circuit, applying the ordinary definition of "may," held that because the Secretary had no absolute duty to remedy the jail conditions, his failure to do so could not "be seen as a cause of those conditions." *Id.* In this case, of course, Mitchell's duty to house safely and appropriately the City's inmates is not discretionary; rather, she is "charged with" that responsibility. Va.Code Ann. § 15.2–1609. Thus, Mitchell's citation to *Reid* is unavailing.

to the realization that the City lacked the "political will" to address the Jail's problems; thus, with the aid of outside counsel, she "started to read the Code of Virginia" with an eye toward finding a legal mechanism through which she could sue the City for failing to maintain the Jail. Mitchell Depo., Feb. 19, 2004, at 91.

This reading certainly would have brought the above cited statutory provisions to Mitchell's attention. *See* Mitchell Depo., Feb. 19, 2004, at 91 ("I started to read the Code of Virginia. And, lo and behold, I saw a statute in there one day.... And, I notified [counsel] that I found that little thing in the Code ... and we ... started talking about suing the City for failing to maintain the Richmond City Jail.").[54] Thus, on this record, it is inferable (if not established) that by 2000, Mitchell was aware of the possibility to transfer inmates to other facilities in order to alleviate the Jail's overcrowding, of recourse to the Richmond Circuit Court to ask for designation of another jail to the same end, and of the ability to sue the City (as her predecessor Winston had done) to provide her with the additional inmate space she required.[55]

Indeed, on this record, it is difficult to believe that Mitchell failed to become aware of the statutes that govern her obligation as Sheriff until 2000. Rather, the record shows that Mitchell was aware of the legal action that Winston, her predecessor, had taken in 1988—legal action which, temporarily at least, had in fact alleviated overcrowding at the Jail. In other words, considering Winston's success in the late 1980s, it is a reasonable inference that Mitchell, at the point she assumed office in 1994, was even then aware that recourse to the Virginia courts was open to her and that this recourse had been successfully employed by her predecessor to alleviate the Jail's overcrowding.

It is uncontested, however, that Mitchell did not seek to utilize Va.Code Ann. § 53.1–71 before September 2001; moreover, it is undisputed that Mitchell has *never* sought to utilize Va.Code Ann. § 53.1–74 or any other provision of Title 53.[56] This is true notwithstanding Mitchell's undisputed subjective knowledge and belief, as recounted in paragraph twenty of her 2001 Petition for Writ of Mandamus, that the Jail "is so crowded that it presents a risk of contagious disease spreading throughout the inmate population."

Thus, Brown has established, as fact, that the Jail was overcrowded. She also has raised a triable issue of fact that Mitchell, who, at the time leading up to Stevenson's illness and death was subjectively aware of the serious medical risks presented by this overcrowding, was deliberately indifferent to those risks by failing to take positive measures to alleviate this overcrowding, including those

---

**54.** Presumably, Mitchell was referring to Va. Code Ann. § 53.1–71, the statutory mechanism Mitchell in fact utilized in 2001.

**55.** Mitchell further testified that the Jail has a "reciprocal agreement" with other local jails in the greater-Richmond area through which Mitchell "can send inmates to other [area] jails." Mitchell Depo., Feb. 19, 2004, at 200. Admittedly, Mitchell discussed this reciprocal agreement not in the context of alleviating overcrowding but rather in the context of "special case[s]," such as avoiding the housing of co-defendants in the same facility pending trial. *Id.* Nonetheless, this reciprocal agreement illustrates that Mitchell was aware of and had indeed engaged in the transferring of inmates from the Jail to other correctional facilities.

**56.** Furthermore, although Mitchell did utilize Va.Code Ann. § 53.1–71 in September of 2001, it does not appear as if she has pressed too vigorously her claim since filing. Indeed, almost three years after its institution, that case apparently is still languishing in the discovery phase.

that experience had shown to have been effective in reducing overcrowding in the past. Simply put, the record here would support a finding that Mitchell, who is statutorily responsible for the safe housing of the City's inmates, knowingly maintained a dangerously overcrowded facility. And, when construed in the light most favorable to the nonmoving party, the fact that Mitchell, by bringing the overcrowding issue to the attention of various City officials, took some steps to alleviate this serious problem does not eliminate the prospect that a jury would so conclude. To be sure, Mitchell can offer that evidence to establish her state of mind. But, that evidence, considered with the record as a whole, merely creates a disputed issue of fact. It does not keep the case from the jury.

All told, Brown has raised a triable issue of fact that Mitchell acted with deliberate indifference in maintaining the allegedly unconstitutional conditions at the Jail and housing Stevenson therein.[57] Thus, respecting Count I, Brown has raised a triable issue of fact that, at the time of Stevenson's death, Mitchell had an official policy or custom of maintaining the Jail in a severely overcrowded condition, thereby

illustrating a deliberate indifference to Stevenson's constitutional rights, and that this custom or policy caused, or contributed to cause, Stevenson's death. *Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Mitchell's motion for summary judgment respecting Count I, therefore, is untenable to the extent that Count I proceeds against Mitchell under a theory of overcrowding.[58]

### (2) Count V: Wrongful Death

■ Count V is a state-law wrongful death claim brought against Mitchell pursuant to Va.Code Ann. § 8.01–50. In Count V, Brown alleges, *inter alia,* that Mitchell was grossly negligent in maintaining the overcrowded conditions at the Jail and that this gross negligence caused Stevenson's death.[59] In order to survive summary judgment on Count V, Brown must raise a triable issue of fact that Mitchell, in her day to day operation and maintenance of the facility, exhibited gross negligence to the overcrowding at the Jail and that this gross negligence caused or contributed to cause Stevenson's death. *Koffman v. Garnett,* 265 Va. 12, 574 S.E.2d 258, 260 (2003).

---

**57.** Of course, in order to survive summary judgment on Count I, Brown must raise a triable issue of fact that Mitchell's policy of indifference caused or contributed to cause Stevenson's death. Here, as mentioned, Mitchell has admitted a causal connection between the overcrowded conditions and Stevenson's death. *See* note 48, *supra.* Moreover, apart from this concession, as discussed above respecting the City in Discussion Section II(B), through the deposition testimony and affidavits of her medical expert, Brown has raised a triable issue of fact that the overcrowding at the Jail caused or contributed to cause Stevenson's death.

**58.** This holding, of course, necessitates a consideration of Mitchell's defense of qualified immunity as to Count I, which is undertaken *infra* in Section III(B)(2)(i).

**59.** The Constitution of Virginia establishes that sheriffs are constitutional officers, who serve independent of the local governments in which they work. Va. Const. art. VII, § 4. As a high-level public employee, Mitchell is entitled to share in the Commonwealth's sovereign immunity from state-law based tort actions. *Glasco v. Ballard,* 249 Va. 61, 452 S.E.2d 854, 856 (1995). Mitchell's immunity, however, is not absolute; rather, by virtue of her position with the sovereign she is insulated from liability for *simple* negligence. *Colby v. Boyden,* 241 Va. 125, 400 S.E.2d 184, 186 (1991). In other words, if Mitchell's actions amounted to "gross negligence," she is not immune from liability. *Id.*

The Supreme Court of Virginia has defined gross negligence as a "degree of negligence" which shows "such indifference to others" as to "constitute[ ] an utter disregard of prudence amounting to the complete neglect of the safety" of another. *Ferguson v. Ferguson*, 212 Va. 86, 181 S.E.2d 648, 653 (1971). It must be such a degree of negligence as would shock fair minded people, although it need not constitute willful recklessness. *Koffman*, 574 S.E.2d at 260. Gross negligence requires an objective inquiry; thus, the defendant's behavior must be compared to that of a hypothetical similarly-situated "reasonable" individual. *Coppage v. Mann*, 906 F.Supp. 1025, 1049 (E.D.Va.1995). Whether certain behavior constitutes gross negligence is generally a factual matter to be left for resolution by the jury, becoming a question of law only when, on the record established, reasonable people could not differ. *Gedrich v. Fairfax County Dept. of Family Servs.*, 282 F.Supp.2d 439, 475 (E.D.Va.2003).

Here, for the reasons discussed above respecting deliberate indifference, the record contains triable issues of fact regarding whether Mitchell, in maintaining the overpopulated Jail and housing Stevenson therein, despite her knowledge that the overcrowding presented a serious risk of the spread of contagious disease, acted with gross negligence. A triable issue of fact exists respecting whether, when compared to that of a reasonable person in Mitchell's position, Mitchell's actions and inactions constitute gross negligence. And, as was true respecting deliberate indifference, when construed in the light most favorable to the nonmoving party, the fact that Mitchell, by bringing the overcrowding issue to the attention of various City officials, took steps to alleviate this serious health problem, does not negate the correctness of this finding. *Coppage*, 906 F.Supp. at 1049 ("[A]n action that is taken in the face of a risk of slight harm might be reasonable; but the same action taken in the face of a risk of extreme harm might be negligent or even grossly negligent.").[60] Mitchell's motion for summary judgment on Count V, therefore, will be denied.

### (i) Mitchell's Defense of Qualified Immunity Respecting Count I

The denial of Mitchell's motion for summary judgment respecting Count I requires an analysis of her defense of qualified immunity. The doctrine of qualified immunity, a federal common law precept applicable in Section 1983 cases, shields official defendants from monetary liability so long as the official's conduct did not violate "clearly established" statutory or constitutional rights of which a reasonable person in the defendant's position would have known. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Weller v. Dep't of Soc. Servs. for City of Balt.*, 901 F.2d 387, 398 (4th Cir.1990); *see generally* Karen M. Blum, *Qualified Immunity: A User's Manual*, 26 Ind. L.Rev. 187 (1993). The principle of qualified immunity reflects the concern that civil damages awards against public officials for every judicially determined violation of rights would discourage individuals from seeking public employment, would prove too injurious to the public fisc, and needlessly would impair governmental decision making. *Weller*, 901 F.2d at 398. The doctrine of qualified immunity, therefore,

---

**60.** Of course, in order to survive summary judgment on Count V, Brown must raise a triable issue of fact that Mitchell's gross negligence caused or contributed to cause Stevenson's death. *Coppage*, 906 F.Supp. at 1049. For the same reasons that were recounted in footnote 57, *supra*, Brown has done so.

mandates that officials "are not liable for bad guesses in gray areas," but rather are only "liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992).

The resolution of Mitchell's qualified immunity defense requires a sequential two-step analysis. *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir.2004).[61] First, it is necessary to determine whether, taken in the light most favorable to the Plaintiff, the facts alleged allow a finding that Mitchell's conduct violated Stevenson's constitutional rights. If the answer to this initial inquiry is an affirmative one, then it is necessary to consider whether the right at issue was "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir.2004); *Gedrich v. Fairfax County Dept. of Family Servs.*, 282 F.Supp.2d 439, 462 (E.D.Va. 2003).

The first step of the qualified immunity analysis is satisfied in this case. As explained above in Discussion Section II(A), the Eighth Amendment is violated when conditions at a jail deprive inmates of one or more basic human needs. *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir.1991). Among those needs is the need for a reasonable amount of space and the need to be free of conditions likely to spread infectious diseases. *Williams*, 952 F.2d at 826. Taken in the light most favorable to Brown, the record permits a finding that Mitchell's conduct in operating the Jail in a severely overcrowded condition likely to result in the spread of infectious disease violated Stevenson's rights under the Eighth Amendment. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Therefore, Mitchell's qualified immunity defense turns on the second step of the qualified immunity analysis: whether the right at issue was "clearly established" at the time of the violation.

In resolving whether a right was "clearly established" at the time of the alleged deprivation, the Court must define the allegedly violated right " 'at a high level of particularity.' " *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir.2003) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir.1999)); *see also Gooden v. Howard County*, 954 F.2d 960, 968 (4th Cir. 1992) (en banc). In other words, although it is clearly established that inmates have a right under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment, *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir.1998), it would be improper to define the right here at issue at so general a level. Rather, defining Stevenson's rights at a broad Eighth Amendment "cruel and unusual" level of generality would risk converting the qualified immunity doctrine into "a rule of virtually *un* qualified liability simply by alleging violations of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (emphasis added); *see also Simmons v. Poe*, 47 F.3d 1370, 1386 (4th Cir. 1995).

Instead, the proper resolution of a qualified immunity defense requires an inquiry into whether the right at issue was clearly established in a more particularized and fact intensive sense. *Parrish*, 372 F.3d at

**61.** As recognized by all the parties, the efficacy of a qualified immunity defense is properly resolved at the summary judgment stage. *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003). The burdens of proof and persuasion with respect to a claim of qualified immunity are on the defendant official asserting the defense. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

301. The contours of the right violated must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.[62] This, in turn, requires identifying the specific conduct of the defendant being challenged by the plaintiff and then determining whether a reasonable official in the defendant's position would have realized that this specific conduct violated the plaintiff's rights. *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992).[63]

Of course, defining the right in this manner does not mean, as Mitchell contends, that the right must be defined to take into account every fact of the specific case under consideration. Mitchell contends that, because Brown is unable to cite to a case presenting the specific fact pattern in this case, qualified immunity attaches. Thus, according to Mitchell, because there is no precedent finding a sheriff, who runs a jail facility owned by a separate political entity and who has tried to get this separate political entity to improve the facility, liable for an inmate's death caused by a disease, of a type that the facility has never before experienced, she is entitled to qualified immunity. Mitchell's argument proves too much.

■ Indeed, to ascertain whether a right is "clearly established" as posited by

Mitchell would mean that, until a particular fact pattern (or an almost identical fact pattern) had been judicially determined to infringe a constitutional right and, thereafter, repeated itself, officials would remain immune from Section 1983 liability.[64] Contrary, however, to Mitchell's argument, the nonexistence of controlling authority holding that the defendant's identical (or virtually identical) conduct is unlawful does not guarantee qualified immunity. *Amaechi v. West,* 237 F.3d 356, 362 (4th Cir.2001). "Clearly established" does not mean that the very actions in question have previously been held unlawful; rather, it merely means that, in light of preexisting law, the unlawfulness of the official's conduct was reasonably and objectively apparent. *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Qualified immunity is not intended to relieve government officials from the responsibility of applying settled legal principles to new, but reasonably analogous, situations; there need not exist a case on "all fours" with the fact pattern presented by the case under review before Section 1983 liability can attach. *Parrish,* 372 F.3d at 301; *Kittoe,* 337 F.3d at 403.

Thus, in resolving the efficacy of Mitchell's qualified immunity defense, it is appropriate to consider not only already specifically adjudicated rights and situations,

**62.** Therefore, determining whether a right was "clearly established" requires the Court to undertake an objective inquiry, dependant not on the subjective beliefs of the particular defendant official, but instead on what a hypothetical, reasonable official would done in the circumstances presented. *Wilson v. Kittoe,* 337 F.3d 392, 402 (4th Cir.2003).

**63.** In resolving the question of what constitutes "clearly established law" courts in the Fourth Circuit are instructed to look only to the decisions of the Supreme Court of the United States, the Fourth Circuit itself, as well as the highest court in the state in which the case arose. *Kittoe,* 337 F.3d at 402.

**64.** Mitchell's argument, unfortunately, has come into vogue in this district. Counsel all too often look to, and cite (often out of context), snippets of qualified immunity decisions and not the doctrine of qualified immunity reflected in Fourth Circuit jurisprudence as a whole. That is precisely what Mitchell has done here. As the Court of Appeals recently explained in *Parrish,* however, the Fourth Circuit rule does not instruct district courts to define the implicated right in terms of decided cases on all fours with the one at issue. And, none of the decisions cited by Mitchell follow the approach that Mitchell urges here.

but also those rights and situations "manifestly included within more general applications of the core constitutional principle involved." *Amaechi*, 237 F.3d at 362–63 (internal citations and quotations omitted); *see also Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Kittoe*, 337 F.3d at 403. Thus, it is necessary to determine whether the allegedly deprived right is reasonably apparent from broader applications of the core constitutional principle in question. *Amaechi*, 237 F.3d at 362–63.

▮▮▮ The core constitutional principle here at issue, as discernable from decisions of both the Supreme Court of the United States and the Fourth Circuit, is that when prison conditions deprive inmates of one or more basic human needs, the inmates' Eighth Amendment rights are violated. *Wilson v. Seiter*, 501 U.S. 294, 298–300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Hutto v. Finney*, 437 U.S. 678, 682, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Strickler v. Waters*, 989 F.2d 1375, 1382 (4th Cir.1993) ("Overcrowding accompanied by unsanitary ... conditions can constitute an Eighth Amendment violation, provided an identifiable human need is being deprived."); *Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir.1991) ("That a totality of prison conditions can be combined to show an Eighth Amendment violation is a proposition established in many cases."). That core Eighth Amendment prohibition against cruel and unusual punishment has been refined to require that officials may not house prisoners under conditions that deprive them of one or more basic human needs, such as the basic human need for reasonable safety, adequate physical space, and the need for some degree of ventilation and fresh air. *Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Wilson*, 501 U.S. at 300, 111 S.Ct. 2321; *Youngberg v. Romeo*,

457 U.S. 307, 315–16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Strickler*, 989 F.2d at 1382; *Williams*, 952 F.2d at 826. The controlling decisional law further establishes that, if the responsible prison official becomes aware that conditions at her facility are depriving inmates of one or more basic human needs, that official must take corrective action. *Wilson*, 501 U.S. at 300, 111 S.Ct. 2321; *Strickler*, 989 F.2d at 1382; *Williams*, 952 F.2d at 826 ("[O]nce prison officials become aware of a problem with prison conditions, they cannot simply ignore the problem, but should take corrective action.").

▮▮▮ It is undisputed that here, Mitchell knew that the overcrowded conditions at the Jail presented an unacceptably high risk of the spread of contagious disease. A reasonable official, armed with this knowledge, would have realized that housing inmates under such conditions was violative of their rights. And, as explained above, the absence of decisional law containing Mitchell's precisely posited facts (*e.g.*, a jail facility owned by a separate political entity, an inmate who dies from a disease that the facility has never before experienced, a jailor who has asked the jail owners to fix the facility's problems) does not entitle her to qualified immunity. Rather, because the applicability of the complained of right on the facts presented here is manifestly apparent from the core constitutional principle, the absence of a case presenting a virtually identical fact pattern to this one is not dispositive. Simply stated, in light of the clearly established legal authority respecting inmates' rights to be housed in prison conditions that meet their basic human needs, a reasonable official in Mitchell's position would have realized that it was a violation of the Constitution to continue to house inmates in a jail that was so grossly overcrowded

that it presented an unacceptably high risk of spreading contagious diseases.

The record here establishes that, construed in Brown's favor, Mitchell's alleged conduct violated Stevenson's "clearly established" constitutional rights; that is, as posited by Brown, Mitchell's conduct transgressed a "bright line," not a mere "gray area." *Maciariello*, 973 F.2d at 298; *see also Parrish*, 372 F.3d at 301. For this reason, Mitchell's qualified immunity defense respecting Count I will be rejected and her motion for summary judgment as to Count I will be denied.

### (C) Count II: Brown's Failure to Train Claim

In Count II, pursuant to Section 1983, Brown alleges that Mitchell failed to institute a proper program to ensure that the deputy guards at the Jail were trained to respond adequately to the medical needs of the inmates and that this failure to train caused, or contributed to cause, Stevenson's death. *See generally City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In order to survive summary judgment respecting this claim, Brown must raise a triable issue of fact respecting the following three elements: (1) that Mitchell's subordinates actually violated Stevenson's constitutional rights; (2) that Mitchell failed to train properly her subordinates thus illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and that (3) this failure to train actually caused the subordinates to violate Stevenson's rights. *Harris*, 489 U.S. at 388–92, 109 S.Ct. 1197; *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000); *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir.1999).[65] These elements, and Brown's showing thereon, are now discussed seriatim.[66]

### (1) Actual Violation of Rights by Subordinates

■■■ To survive summary judgment respecting the first element of a failure to train claim, Brown must raise a triable issue of fact that Mitchell's subordinates actually violated Stevenson's rights. *Young v. City of Mt. Rainer*, 238 F.3d 567, 579 (4th Cir.2001). In support of the first element of her failure to train claim, Brown alleges that John Does 1–10 (who are unidentified deputy guards employed by the Jail) violated Stevenson's Eighth Amendment right to be free from cruel and unusual punishment. An Eighth Amendment claim of this sort requires a showing that the guards were "deliberately indifferent to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Lawrence v. Va. Dep't of Corr.*, 308 F.Supp.2d 709, 719 (E.D.Va.2004). Specifically, the plaintiff asserting this type of Eighth Amendment claim must show that: (1) objectively the medical need was serious; and (2) subjectively the guards acted with a sufficiently culpable state of mind, that is, they failed to act in the face of a

---

**65.** For a more fulsome discussion of the legal principles implicated by Mitchell's failure to train claim, *see Brown*, 308 F.Supp.2d at 701–706.

**66.** Mitchell asserts that, because *Harris* involved the imposition of liability on a municipality for its alleged failure to train, and, in Count II, Brown is seeking to establish liability on Mitchell, who, although a supervisor is obviously not a municipality, the *Harris*

framework is inapplicable. This argument, however, ignores the fact that courts, including the Fourth Circuit, apply the *Harris* framework to failure to train cases in which the plaintiff is seeking to establish liability against an individual or entity other than a municipality. *E.g., Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir.1994) (en banc); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994); *Greason v. Kemp*, 891 F.2d 829, 836 (11th Cir.1990).

subjectively known risk. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir.1998).

It is not disputed that Stevenson died from bacterial meningitis. Nor, is it disputed that bacterial meningitis is an objectively serious medical condition. Moreover, Tyrone Peete ("Peete"), Timothy Miles ("Miles"), and Javonne Walker ("Walker"), inmates incarcerated with Stevenson during the time period leading up to his death, have submitted sworn affidavits that are replete with instances when guards ignored Stevenson's obviously serious medical condition. Peete, Miles, and Walker's affidavits all discuss Stevenson's heavy sweating, vomiting, incoherence, and inability to walk under his own power. Indeed, the evidence given by those witnesses is that Stevenson's condition was such that, had they been able to do so, they would have transported him to an emergency room themselves.

Peete, Miles, and Walker further have testified that the deputy guards at the Jail, although having both witnessed and been informed about Stevenson's condition, took virtually no action in response. Illustrative of this point is the sworn statement of Walker:

> The deputies patrolling the tier would look at Mr. Stevenson and do or say nothing and then leave without taking any action in spite of the fact that he was obviously ill and in spite of my requests and the requests of other inmates.

Affidavit of Walker, at 6 ¶ 49. Similarly, Miles' affidavit explains: "Each time I approached the deputies with my requests for medical help for Mr. Stevenson, I was ignored." Affidavit of Miles, at 7 ¶ 50.

It is also significant that, although Mitchell employs the guards, she has offered no evidence from them to refute what Brown has shown. Brown, therefore, is entitled to the inference that the guards cannot, or will not, refute, what Peete, Miles, and Walker have sworn to as fact.

In sum, Brown has raised a triable issue of fact respecting whether the guards acted with deliberate indifference to Stevenson's objectively serious medical condition. Thus, Brown has satisfied the first element of her failure to train claim. *Harris*, 489 U.S. at 388–92, 109 S.Ct. 1197.

### (2) Deliberate Indifference and Failure to Train

■ Of course, raising a triable issue of fact respecting the deliberate indifference of the guards, standing alone, does not establish a failure to train claim. *Harris*, 489 U.S. at 389, 109 S.Ct. 1197. Rather, Brown must present evidence that Mitchell failed properly to train her employees, thereby evidencing a deliberate indifference to the rights of the inmates with whom the subordinates will come into contact. *Id.* at 388, 109 S.Ct. 1197. To do so, Brown must point to specific defects in Mitchell's training program and illustrate how the training plan was inadequate in relation to the tasks the subordinates' jobs required them to perform. *Harris*, 489 U.S. at 390, 109 S.Ct. 1197.[67] On this record, it cannot be said that Brown has established a triable issue of fact on this element.

In defending against Count II, Mitchell, referencing testimonial and documentary evidence, submits that she has instituted a comprehensive, state-approved training

---

**67.** If, despite an adequate training regime, employees deviate from or simply ignore their training, supervisory liability should not ordinarily attach. *Harris*, 489 U.S. at 390, 109 S.Ct. 1197. Rather, fastening supervisory liability in such circumstances would be inconsistent with the *Monell* Court's instructions that Section 1983 liability may not be premised upon respondeat superior liability.

program for deputy guards at the Jail and that this training program involves ample training respecting inmates' medical needs. This evidence largely centers around the sworn affidavits of John M. Pancoast ("Pancoast"), the captain in Mitchell's office who is in charge of the in-house deputy sheriff training program. Decl. of Pancoast, at 1 ¶ 2.[68]

Pancoast avers that, because a major duty of the Richmond City Sheriff's Office is to operate the City's jail system, the training program provided to the in-coming deputies largely revolves around the Jail. This Jail-related training program consists of three major components: (1) on the job training with Field Training Officers ("FTOs"); (2) classes at the Richmond in-house training academy; and (3) periodic in-service ongoing educational training for deputies. Pancoast asserts that throughout this training the instructors teach deputies on the proper way to respond to the medical needs of inmates.

In particular, Pancoast says that the training program teaches the deputies to identify and respond to inmates' medical situations. In support of this assertion, Mitchell has submitted, as an attachment to Pancoast's declaration, a copy of the study materials the Sheriff's Office provides to the deputies for their training. In these materials, a topic of study and discussion is the methods that deputies must employ to recognize sick and injured inmates. Indeed, the study materials note that the courts have established that inmates have a right to reasonable and adequate medical care; the study materials go so far as to reference the relevant Eighth Amendment standards. The study materials teach the deputy guards how to recognize the symptoms of infectious and communicable diseases in general, as well as the symptoms of several specific ailments that deputies are likely to encounter in the jail system, e.g., HIV/AIDS and tuberculosis. The materials also discuss how to provide services to inmates suffering from several non-communicable medical conditions, e.g., epilepsy and diabetes.

Pancoast maintains that the training program teaches deputies that they are to look for sick and injured inmates every time they make their rounds in the Jail. Moreover, pursuant to the Jail's Standard Operating Procedures ("SOPs") in effect in July and August 2001, the deputies were required to make these rounds twice per hour.[69] Pancoast further notes that the deputies are trained to conduct at least one "count" during every eight-hour shift.[70] In the training academy, deputies are taught that they are obligated to check for inmates exhibiting signs of sickness or injury during the counts as well.

68. By way of general background: in Virginia, all deputy sheriffs are required to complete successfully a training program approved by the Virginia Department of Criminal Justice Services ("DCJS"). *See* Va.Code. Ann. § 15.2–1612.1. Indeed, the Virginia General Assembly has charged the DCJS with ensuring that the deputy sheriff training programs conducted throughout the Commonwealth meet DCJS standards, *see* Va.Code. Ann. § 9.1–102; DCJS has a certification program to meet this mandate. Many of the supplicant deputy sheriffs throughout the Commonwealth receive their training at one of several regional · academies certified by DCJS. Larger sheriff offices, however, such as Richmond's, have in-house training academies. Although the fact is by no means dispositive, it is undisputed that the Richmond City Sheriff Office's deputy training program was DCJS certified and compliant at all times relevant to this action.

69. The SOPs in effect in July and August 2001, which all deputies then working were required to read, state, *inter alia,* that during their rounds, deputies are to check for inmates exhibiting signs of "sickness or injury."

70. The definition of "count" is set forth at footnote 4, *supra.*

During the on-the-job training portion of their education, the deputies work with their FTOs on the proper procedure to call for medical assistance. The FTOs train the deputies to accept written requests for routine medical needs and to respond to verbal requests for emergency medical needs. The deputies are trained not to make medical diagnoses themselves, but rather to leave this function to the medical staff.[71] They are further taught, however, that medical service is available on a twenty-four hour basis; indeed, in order that they can take advantage of this round-the-clock availability of medical care, the deputies are taught a special radio code for transmitting the existence of a medical emergency.

In an attempt to rebut the showing made by Mitchell and Pancoast, the Plaintiff again relies on her prison conditions expert, Dr. Alvin W. Cohn. On this topic, Dr. Cohn acknowledges that Mitchell had in place a training program for her deputies respecting inmates' medical needs; in fact, Dr. Cohn has opined that Mitchell's orientation and initial training program "is probably adequate and appropriate." Cohn Depo., March 8, 2004, at 69.

Dr. Cohn, however, takes issue with several perceived shortcomings respecting that portion of Mitchell's training program that occurs subsequent to the initial orientation and training; specifically: (1) a lack of regular or surprise reviews of the deputies on the job and a lack of a program to ensure compliance with the relevant SOPs; (2) a lack of testing of deputies following the initial training to ensure retention of the initial education; (3) a lack of continuing education and training for deputies

throughout their careers; (4) a lack of training in response to the 1999 staphylococci infection; (5) a lack of training regarding bacterial or viral meningitis; and (6) a lack of training in response to Stevenson's death and a lack of investigation and discipline following Stevenson's death. These alleged shortcomings, however, are either actually nonexistent or simply irrelevant to Brown's current action.

The major (and ultimately fatal) defect in the opinions offered by Dr. Cohn is that the majority of his opinions respecting flaws in Mitchell's training program are based on inferences he drew from the fact that he did not see certain items in the materials he reviewed. Exemplary of this defect is Dr. Cohn's conclusion, reached because he did not see any documents suggesting otherwise, that Mitchell failed to conduct regular or surprise evaluations of the deputies to ensure that they were actually instituting what they learned during training and that they were following the instituted procedures and SOPs. During deposition, Mitchell's lawyer questioned Dr. Cohn respecting on-the-job deputy monitoring and evaluation:

Q: Do you know whether or not that occurs?

A: I have to assume it doesn't occur.

Q: I'm sorry, I apologize. I obviously asked my question incorrectly. Do you know whether that occurred?

A: [I]n the absence of documentation, I have to assume it didn't.

Cohn Depo, March 8, 2004, at 52. Thus, Dr. Cohn's opinion respecting the deficiency of Mitchell's training program is not

---

**71.** Brown has offered evidence tending to show that several of the deputies in charge of Stevenson in August 2001 violated this training by themselves engaging in medical diagnosis. Specifically, Miles has stated that several guards patrolling the Jail diagnosed Stevenson's condition "heroin withdraw" and therefore ignored other inmates' pleas that Stevenson was sick. Affidavit of Miles, at 13 ¶ 100. As noted above, however, the mere fact that Mitchell's subordinates failed to abide by their training does not establish a Section 1983 failure to train claim. *Harris*, 489 U.S. at 390, 109 S.Ct. 1197.

based on actual knowledge that Mitchell's training program did not involve regular or surprise reviews; rather, he merely infers that it did not because he saw nothing to suggest to him otherwise.

Mitchell, in rebuttal, has offered actual evidence that her training program did indeed involve the regular and surprise evaluation of the deputies on the job and that she had in place a method to ensure deputy compliance with the relevant training SOPs. Specifically, Jail supervisors are required to patrol the entire facility at least two times during a shift in order to ascertain whether deputies are conducting their tasks; moreover, these supervisors are to engage in surprise checks of the deputies. Affidavit of Michaels, at 1 ¶ 5; Affidavit of Roehm, at 2 ¶¶ 5–6. During their twice-daily patrols, the supervisors are required to ensure that the deputies are abiding by the SOPs. In addition, the deputys' performance and compliance with Jail protocol are reviewed formally once a year. Affidavit of Michaels, at 1 ¶ 4.

Similarly, although Dr. Cohn has testified that Mitchell's training program did not ensure testing of deputies in order to ensure retention of the taught materials and that this defect shows deliberate indifference, he again bases this conclusion on the fact that he did not review any documents that led him to conclude otherwise. Mitchell, however, has offered real evidence that her in-house deputy training program requires deputies to pass tests on each unit of training and to pass a final examination taken at the conclusion of the academy program. In addition, the deputies receive daily testing reviews during their first thirty days on the job.

Likewise, although Dr. Cohn concludes, from a lack of documents suggesting the opposite, that Mitchell's training program is deficient because it does not involve any ongoing training of deputies throughout their careers, Mitchell has offered actual evidence that the Jail engages in continuing education and training. Specifically and relevantly for this action, Mitchell says that she provides continuing education to her deputies respecting infectious diseases on a yearly basis. In addition, her evidence is that the deputies receive monthly training on various topics respecting the Jail; not infrequently these monthly continuing education sessions involve medical issues.

As to Dr. Cohn's assertion respecting the lack of training of deputies to recognize meningitis: during deposition, Dr. Cohn himself admitted that, in his expert opinion, Mitchell has no duty to provide her deputies with specific training on meningitis. Cohn Depo., March 8, 2004, at 9. Rather, he opined that Mitchell has a duty to train deputies respecting communicable and infectious diseases generally. And, Mitchell, through Pancoast, has provided evidence that she does in fact train her deputies respecting communicable and infectious diseases; and, as noted above, Brown has not raised a triable issue of fact otherwise. Thus, the lack of training regarding meningitis specifically does not raise a triable issue of fact that Mitchell's training program was constitutionally defective.

Finally, Dr. Cohn asserts that the fact that Mitchell did not institute any additional training, conduct an investigation, or discipline any deputies following Stevenson's death is evidence that Mitchell was deliberately indifferent respecting her training program. These contentions, however, are simply irrelevant. Although Mitchell has offered evidence in rebuttal to this final allegation, what she did or did not do following Stevenson's death has no bearing on this case; in no way can these alleged failures on Mitchell's part that antedate Stevenson's death have any causal connection to his death.

In sum, Brown has failed to raise a triable issue of fact that Mitchell's training program evinces a deliberate indifference to the rights of those inmates with whom the deputy guards come into contact. Dr. Cohn's asserted shortcomings with Mitchell's training regime are largely based on negative inferences; "in the absence of documentation, [Dr. Cohn] ... assumed [the specific training] didn't [occur]." Cohn Depo, March 8, 2004, at 52. Such assumptions, when rebutted by evidence that the allegedly absent training protocol did in fact occur, fall well short of raising a triable issue of fact. The remainder of Dr. Cohn's opinion on the insufficiency of Mitchell's program involves the problems with the training program after Stevenson's death; as noted above, such faults, whatever their veracity, are irrelevant to this action.[72] Summary judgment, therefore, will be entered in Mitchell's favor on Count II.[73]

## IV. Dr. Freund's Motion for Summary Judgment

The FAC contains three claims against Dr. Freund: (1) Count IV alleges an Eighth Amendment violation by way of Section 1983; (2) Count VII alleges a wrongful death claim under Virginia law; and (3) Count VIII alleges a medical malpractice claim under Virginia law. Dr. Freund has moved for summary judgment on all three counts.

### (A) Count IV: 42 U.S.C. § 1983

In Count IV, Brown alleges that Dr. Freund violated Stevenson's Eighth Amendment right to be free from cruel and unusual punishment. In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that a medical professional violates the Eighth Amendment when he shows "deliberate indifference" to a prisoner's "serious" medical needs. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285; *see also Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir.1996); *Lawrence v. Va. Dept. of Corr.*, 308 F.Supp.2d 709, 719 (E.D.Va.2004). In order to survive summary judgment on Count IV, Brown must raise a triable issue of fact respecting the following: (1) the denial of a medical need that objectively was so serious as to implicate the ban against cruel and unusual punishment; (2) that the doctor [74] acted with a sufficiently culpable state of mind—that is, he deliberately did not act in the face of a subjectively known risk; and (3) the doctor's conduct caused, or contributed to cause, the injury or consequence of which the Plaintiff complains. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir.1998); *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir.1997).[75]

---

72. Because Brown has failed to raise a triable issue of fact respecting Mitchell's deliberate indifference regarding the training of Jail guards, the Court need not address the element of causation. Nor is it necessary to address Mitchell's defense of qualified immunity as to Count II.

73. In argument, Brown contends that the training program existed only on paper. If that is true, the Plaintiff likely could have shown it by securing the testimony of the deputy guards, for instance, Defendants John Does 1 through 10. For reasons neither explained nor readily apparent, however, Brown did not secure that evidence.

74. The medical professional must, of course, act "under color of law" in order for Section 1983 liability to attach. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). It is undisputed, however, that Dr. Freund acted under color of law in his treatment of Stevenson.

75. A mere disagreement on the course of treatment ordered by a doctor does not state a colorable Eighth Amendment claim of this sort. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir.1985); *Davis v. Lester*, 156 F.Supp.2d 588, 598 (W.D.Va.2001). Likewise, mere medical malpractice does not state an Eighth Amendment claim, *Estelle*, 429 U.S. at 105, 97 S.Ct. 285, nor does mere negligence in diagnosis. *Sosebee v. Murphy*, 797 F.2d 179,

### (1) Whether Stevenson was Suffering from an Objectively Serious Medical Condition

There can be no doubt that Stevenson's medical condition was objectively a "serious" one. Bacterial meningitis can—and in this case unfortunately did—cause crippling health problems and death. Dr. Freund does not challenge this rather obvious fact. Nor does Dr. Freund argue that severe dehydration, a condition that he diagnosed, is not an objectively serious medical condition. Further, a person who is vomiting, sweating profusely, suffering from fever and chills, is unable to walk without assistance, has persistently worsening headaches, and is unresponsive to external stimuli is, by any definition of the term, exhibiting a "serious medical need." Thus, there is no question that Brown has created a triable issue of fact on the first element of her Section 1983 claim against Dr. Freund. And, that is true even though Dr. Freund contends that Stevenson did not manifest those conditions and notwithstanding Dr. Freund's belief that Stevenson did not suffer from bacterial meningitis.

### (2) Deliberate Indifference on the Part of Dr. Freund

■ A plaintiff pursuing a Section 1983 Eighth Amendment claim of the sort posited here must show that the medical professional failed to take appropriate action despite a subjective awareness of a serious medical condition. *Rish*, 131 F.3d at 1096. *Cf. Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Here, Dr. Freund asserts that, at the time he examined Stevenson and provided his diagnosis, he was not subjectively aware that the patient had bacterial meningitis or was suffering from a serious ailment. Rather, Dr. Freund argues that he diagnosed Stevenson with a viral infection and thereafter provided treatment as he thought appropriate. Dr. Freund, therefore, argues that Brown has failed to raise a triable issue of fact respecting deliberate indifference.

In support of this argument, Dr. Freund notes that it is an undisputed fact that he performed a test for bacterial meningitis— in particular, a nuchal rigidity test, *i.e.,* he felt Stevenson's neck to ascertain whether it was stiff—which returned a negative indication for bacterial infection. Dr. Freund asserts that, after examining the patient, he subjectively believed that Stevenson was suffering from a viral infection and dehydration. Dr. Freund contends that, based on his diagnosis, he ordered a course of treatment that he thought appropriate. In sum, Dr. Freund argues that there are no facts in dispute concerning his treatment of Stevenson that show that he was aware of a serious medical condition and nonetheless ignored it. Def. Freund Mem. in Supp. of Summ. J., March 24, 2004, at 13 ("[Dr. Freund] did not suspect that Stevenson had meningitis, and believed based on the symptoms presented that Mr. Stevenson had a viral infection and that he would get better.").

When, however, the evidence is construed in the light most favorable to the Plaintiff, the record contains triable issues of fact respecting whether Dr. Freund exhibited deliberate indifference. Indeed, so construed, the record shows that Dr. Freund was confronted with facts pointing to a serious medical condition (specifically, a non-responsive, aspleanic patient who was vomiting, had a high fever, headaches, persistent heavy sweating, and chills), and, importantly, that Dr. Freund drew the inference that serious medical conditions did in fact exist.[76] And, notwithstanding Stevenson's symptoms and Dr. Freund's attendant diagnosis, Dr. Freund ordered

---

181 (4th Cir.1986); *Lawrence v. Va. Dep't of Corr.,* 308 F.Supp.2d 709, 720 (E.D.Va.2004).

**76.** On this record, Dr. Freund's self-serving statements that he did not believe Stevenson's condition to be serious would certainly not preclude a jury from finding otherwise.

Stevenson, a patient whom he knew to be lacking a spleen, returned to a general population unit in the unairconditioned, overcrowded, and poorly ventilated Jail.[77]

Moreover, although it is undisputed that Dr. Freund prescribed Stevenson headache medicine, a nausea reducer, and instructed Jail personnel to check on Stevenson occasionally, when presented with an aspleanic patient in Stevenson's condition, the record contains evidence that Dr. Freund's chosen course of treatment was tantamount to a decision to do nothing at all. For this reason, Dr. Freund is not sheltered by the rule that a Section 1983 plaintiff's mere disagreement with a prison doctor's chosen course of treatment does not state a cognizable Eighth Amendment claim. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir.1985). To hold otherwise would allow a doctor, by providing some minimal amount of medical care that he could later describe as a nonreviewable "choice of treatment," to innoculate himself completely from Section 1983 liability.

Brown has proffered expert testimony on this topic. Dr. David Anthony Clark ("Dr.Clark") has opined that, by ordering an individual with Stevenson's medical history who was exhibiting his symptoms to be returned to the general population unit of a poorly ventilated, severely overcrowded jail, Dr. Freund demonstrated a deliberate indifference to Stevenson's serious medical condition:

> The breach of the standard of care by Dr. Jack Freund was not simple negligence but was sufficiently egregious to constitute deliberate indifference for Mr. Stevenson's right to receive adequate medical treatment.... This deliberate indifference is demonstrated by Dr. Freund's order that Mr. Stevenson be returned to his unairconditioned, overcrowded cell without medical supervision despite the fact that he was febrile, appeared ill and was dehydrated. This deliberate indifference is also manifested in the fact that Dr. Freund diagnosed Mr. Stevenson as being dehydrated, but did not order any treatment for this dehydration.

Clark Affidavit, Oct. 20, 2003, at 4. Thus, Dr. Clark contends that, in his expert

---

77. Contrary to his contentions, Dr. Freund's purported failure to diagnose bacterial meningitis, even if true, is not dispositive of this issue because no case holds that a doctor must subjectively be aware of the precise ailment from which the patient is suffering. Rather, the decisional law teaches that, in order to exhibit deliberate indifference, the medical professional must subjectively think that the patient's condition, whatever its source, is *serious* and yet fail to take commensurate action. The decision in *Johnson v. Quinones*, 145 F.3d 164 (4th Cir.1998), on which Dr. Freund relies, is not to the contrary. In that case, prison doctors concluded that an inmate was suffering from a nonserious medical condition treatable with ordinary eyeglasses and ordered treatment accordingly. In fact, however, the inmate was actually suffering from a quite serious pituitary gland tumor that eventually resulted in partial blindness. The Fourth Circuit rejected the plaintiff's Section 1983 Eighth Amendment claim, ruling that the doctors' actions constituted, at best, mere misdiagnosis. The *Quinones* case, however, does not stand for the proposition that an Eighth Amendment plaintiff must show that the doctors were subjectively aware of the precise ailment from which the inmate was suffering. Rather, because, in *Quinones*, the doctors subjectively, albeit incorrectly, thought the inmate was suffering from ordinary eyesight difficulties, their chosen course of treatment did not constitute deliberate indifference. In contrast, in this case, even if Dr. Freund did misdiagnose Stevenson's ailment, the ailments that he purportedly did diagnose, *i.e.*, viral infection and dehydration, *see* Freund Depo., Feb. 10, 2004, at 80, were sufficiently serious, especially when presented by an aspleanic patient, to render his course of treatment, namely, an aspirin and a return to a sweltering overcrowded jail, arguably deliberately indifferent.

opinion, considering the patient and the symptoms presented, Dr. Freund's actions constituted deliberate indifference.[78]

In sum, Brown has raised a triable issue of fact respecting whether Dr. Freund's treatment of Stevenson was deliberately indifferent. Thus, she has proffered sufficient evidence for purposes of summary judgment to satisfy the second element of the *Estelle* formulation.

### (3) Causation

■■■ Finally, under *Estelle*, in order to survive summary judgment, Brown must raise a triable issue of fact that a causal link exists between Dr. Freund's deliberate indifference and Stevenson's subsequent death. A review of the record illustrates that she has done so.

On the proffered evidence, a reasonable jury could conclude that, if Dr. Freund had not exhibited deliberate indifference and sent Stevenson, a dehydrated, feverish patient lacking a spleen, back to the poorly ventilated overcrowded Jail, but had rather treated Stevenson appropriately, Stevenson would have recovered. As submitted by Dr. Clark, a timely recognition of the bacterial infection would have prompted immediate treatment with antibiotics which, to a high degree of medical likelihood, would have saved Stevenson's life. Second Decl. of Clark, April 2, 2004, at 4 ¶ 13. Thus, a triable issue of fact exists whether Dr. Freund's deliberate indifference caused or contributed to cause Stevenson's death.

In sum, therefore, Brown has a raised triable issues of fact as respects all ele-

ments of her Eighth Amendment claim pending against Dr. Freund. The Court, therefore, declines Dr. Freund's invitation to enter summary judgment as to Count IV.

### (i) Qualified Immunity

■■■ The denial of Dr. Freund's motion for summary judgment on the merits of Count IV necessitates resolution of Dr. Freund's affirmative defense of qualified immunity. Dr. Freund asserts that, even if there is a triable issue of fact respecting whether he violated Stevenson's Eighth Amendment rights, he is nevertheless protected by the doctrine of qualified immunity. This contention, however, is without merit.[79]

Although, unlike Sheriff Mitchell, Dr. Freund recognizes that there need be no case with a fact pattern identical to his, *see Kittoe*, 337 F.3d at 403, Dr. Freund posits that there is no fair warning in the relevant decisional law that would have put him on notice that his conduct violated Stevenson's constitutional rights. In making this argument, Dr. Freund culls several shortcomings in his conduct cited by Dr. Clark and Brown—*e.g.*, his failure to order a white blood count and his failure to provide intravenous fluids—and posits that a reasonable doctor in his position would not have realized that a failure to conduct such treatment would run afoul of the Eighth Amendment.

This argument, however, ignores the overall import of Brown's claim, as well as the import of Dr. Clark's testimony and opinions.[80] Although Brown and Dr. Clark

---

78. Notably, contrary to Dr. Freund's arguments, this expert opinion is not predicated on any asserted failure by Dr. Freund to diagnose bacterial meningitis.

79. The standards applicable to the defense of qualified immunity were set forth above in the context of Mitchell, *supra*, Discussion Section III(B)(2)(i), and need not be repeated here.

80. The argument further ignores the fact that certain portions of Dr. Clark's affidavit are clearly included in furtherance of the state law medical malpractice claims pending against Dr. Freund, as opposed to the Section 1983 allegation.

do take issue with Dr. Freund's failure to order blood counts and failure to provide intravenous fluids, the thrust of Brown's claim is that Dr. Freund, who subjectively realized that his immuno-compromised patient was suffering from a serious medical condition, did virtually nothing in response. As outlined above, that contention is supported by evidence. And, the decisional law is quite clear that prison doctors have a constitutional obligation to provide medical treatment to inmates in their care. *Estelle,* 429 U.S. at 104, 97 S.Ct. 285; *Quinones,* 145 F.3d at 167; *see also Johnson v. Williams,* 768 F.Supp. 1161, 1165 (E.D.Va.1991) (citing numerous decisions of the Supreme Court of the United States and of the Fourth Circuit, stating: "It is well settled that deliberate indifference to a prisoner's serious medical needs constitutes a violation of the Eighth Amendment."). For this reason, Dr. Freund's qualified immunity defense is rejected and Dr. Freund's motion for summary judgment respecting Count IV will be denied.

### (B) The State Law Claims Against Dr. Freund

As mentioned, Count VII alleges a wrongful death claim against Dr. Freund while Count VIII alleges a medical malpractice claim against him. Both of these counts proceed under Virginia law. Va. Code Ann. §§ 8.01–50, 8.01–581.1.

In moving for summary judgment on these claims, Dr. Freund asserts a two-tiered argument. First, Dr. Freund posits that, under Virginia law, he is entitled to share in the City's sovereign immunity. *Messina v. Burden,* 228 Va. 301, 321 S.E.2d 657, 663 (1984). After purporting to establish his entitlement to sovereign immunity,[81] which would entitle him to immunity from claims predicated on allegations of simple negligence and thereby render him liable only for actions constituting *gross* negligence, *Glasco v. Ballard,* 249 Va. 61, 452 S.E.2d 854, 856 (1995), Dr. Freund goes on to argue that Brown has presented insufficient evidence to support a finding of gross negligence. Dr. Freund's arguments, however, do not withstand scrutiny.

### (1) Under Virginia Law, Dr. Freund is not Entitled to Sovereign Immunity

The efficacy of Dr. Freund's affirmative defense of sovereign immunity was significantly undermined when, after the completion of briefing and oral argument on summary judgment, Brown's counsel, through discussions with another attorney in the local bar, uncovered the original iteration of the contract governing Dr. Freund's arrangement with the City.[82] That contract, which, through several continuation contracts, extended to govern Dr. Freund's relationship with the City in August 2001, is styled "City of Richmond Professional/Non–Professional Services

---

81. As the party moving for its protection, Dr. Freund bears the burden of proof as to his plea of sovereign immunity. *Whitley v. Commonwealth,* 260 Va. 482, 538 S.E.2d 296, 302 (2000).

82. As an initial matter, in resolving a public employee's claim of sovereign immunity, a court must first determine whether the public employer is itself entitled to immunity. *Linhart v. Lawson,* 261 Va. 30, 540 S.E.2d 875 (2001). Here, as recognized in the March 9 Opinion, because the operation of a jail is a purely governmental function, the City is entitled to immunity from state tort-law liability for actions arising from its operation of the Jail. *Brown,* 308 F.Supp.2d at 691. Thus, because the City, from whom Dr. Freund draws a paycheck, enjoys sovereign immunity respecting the challenged actions, the defense of sovereign immunity, at least in concept and potential, is available to Dr. Freund. *Coppage v. Mann,* 906 F.Supp. 1025, 1048 (E.D.Va. 1995).

Contract." The first page of the contract states in part:

> NOW THEREFORE, for and in consideration of the mutual undertakings of the parties to this Contract, the City and the Chief Physician hereby agree ... that the Chief Physician shall provide services as an independent contractor in accordance with the terms and conditions of this Contract.

As a matter of Virginia law, this contractual provision, if it correctly describes Dr. Freund's status, is fatal to Dr. Freund's asserted sovereign immunity defense.

According to the Supreme Court of Virginia, only municipal employees are entitled to share in the sovereign immunity of their municipal employers; independent contractors acting on behalf of the municipality are not entitled to this protection. *Atkinson v. Sachno*, 261 Va. 278, 541 S.E.2d 902, 905 (2001). Here, under the clear and unambiguous description contained in the controlling document, Dr. Freund is an independent contractor, not an employee.

Nonetheless, Dr. Freund correctly notes that, under Virginia law, if the evidence shows that a description contained in the governing contract does not accurately describe the situation, the nomenclature provided in the contract is not dispositive of the actual nature of the relationship. *Thaxton v. Commonwealth*, 211 Va. 38, 175 S.E.2d 264, 268 (1970). In resolving the question whether a publicly-financed medical provider is an independent contractor or an employee, Virginia courts consider: (1) the selection and engagement of patients; (2) the payment and compensation of the doctor; and (3) the public entity's power to control the work of the doctor. *Hadeed v. Medic–24, Ltd.*, 237 Va. 277, 377 S.E.2d 589, 594 (1989). The last factor, "control," is determinative. *Atkinson*, 541 S.E.2d at 905. Here, Dr. Freund asserts that, notwithstanding the "independent contractor" language on page one of the contract, the balance of the instrument negates its initial description of Dr. Freund's status. Specifically, Dr. Freund asserts that the substantive provisions of the contract illustrate that the City exercises a great deal of control over him, thereby indicating that he is an employee.

Dr. Freund notes that, under his contract with the City, he is required to see *all* patients referred to him by Jail staff—in other words, he has no control over the selection or engagement of Jail patients. *Lee v. Bourgeois*, 252 Va. 328, 477 S.E.2d 495 (1996). In addition, he treats these patients in facilities owned by the City and with equipment owned by the City. *Lohr v. Larsen*, 246 Va. 81, 431 S.E.2d 642 (1993). Further, the contract controls Dr. Freund's obligations and duties towards Jail staff: Dr. Freund is required to consult with and assist Jail personnel with respect to all medical-related issues on an as-requested basis. Also, he is contractually required to be on call with Jail personnel twenty-four hours a day. Finally, respecting compensation, Dr. Freund is not paid on a per-patient basis, but rather receives a set salary for his work at the Jail, an arrangement indicative of employee status. *Atkinson*, 541 S.E.2d at 905.

Considering, however, that the patients to be treated under Dr. Freund's contract are prisoners confined in a jail, it is unremarkable that he must treat all comers, that he must do so in a specified place, that he uses equipment put in that place by the City, that he is on call round the clock, and that the mode of payment is a set salary rather than a per-patient fee. Thus, those factors do not undercut, or even call into question, the contractual description of Dr. Freund as an independent contractor.

More importantly, under Virginia law, is the undisputed fact that Dr. Freund has

sole control over the course of treatment ordered for Jail patients. In other words, his contract with the City in no way impinges on the discretion typically enjoyed by physicians respecting treatment of their patients. *Cf. Lee*, 477 S.E.2d at 497 ("[A] physician's exercise of professional skill and judgment in treating a patient is not subject to the control of the Commonwealth."). Thus, as to the most critical portion of his work for the City—treating patients—Dr. Freund enjoys complete control.

Finally, there is the highly significant and undisputed fact that, under the contract, Dr. Freund can—and indeed does—subcontract to other doctors his contractual duties. Specifically, during the time period leading up to and including Stevenson's death, Dr. Freund subcontracted out his work with the Jail to several other doctors. This subcontracting is completely contrary to Dr. Freund's posited description of his relationship with the City; an employee does not have such power. Indeed, it is axiomatic that employees are not free to engage other individuals to accomplish the work for which they were hired. *See* William A. Gregory & Harold G. Reuschlein, *The Law of Agency & Partnership* § 7 (2d ed.1990) (noting that, "except in emergency situations," a servant may rarely "delegate the performance of his duties").

For the foregoing reasons, Dr. Freund's posited defense of sovereign immunity must fail.[83] As a result, Dr. Freund is not immune from liability for acts of simple negligence and Brown need not establish gross negligence in order to prevail on her state law claims.

### (2) Brown has Submitted Sufficient Evidence to Support a Finding of Negligence

As defined by the Supreme Court of Virginia, "negligence" is the failure to use "the degree of care that an ordinary person would exercise to avoid injury to another." *Wilby v. Gostel*, 265 Va. 437, 578 S.E.2d 796, 801 (2003). Unlike deliberate indifference, a finding of negligence does not require the plaintiff to prove any subjective knowledge. Rather, the plaintiff must simply show that, under the facts as presented to the defendant, a hypothetical similarly-situated reasonable individual would have been aware of the risk presented. *Coppage*, 906 F.Supp. at 1049. Whether certain actions constitute negligence is generally a factual matter that requires resolution by a jury; the question of negligence becomes a question of law only when, on the undisputed facts, reasonable people could not differ. *Koffman v. Garnett*, 265 Va. 12, 574 S.E.2d 258, 260 (2003); *Arnold v. Reynolds*, 215 Va. 431, 211 S.E.2d 46, 47 (1975); *Big Stone Gap v. Johnson*, 184 Va. 375, 35 S.E.2d 71, 73 (1945).

Dr. Clark, Brown's medical expert, opines that Dr. Freund breached the applicable standard of care and acted negligently in treating Stevenson. Indeed, Dr. Clark posits that Dr. Freund acted in *gross* dereliction of the applicable standard of care. Dr. Clark contends that Dr. Freund's decision to return Stevenson, a

**83.** Resolution of whether a person is an independent contractor or an employee is generally a question of fact for the jury. When, however, the undisputed evidence admits of but one conclusion, the question is one of law amenable to resolution at the summary judgment stage. *Atkinson*, 541 S.E.2d at 905; *Hadeed*, 377 S.E.2d at 594. In light of the description of Dr. Freund's status in the controlling contract, as well as Dr. Freund's ability to control completely the treatment that he provides and to farm out his contractual obligations with the City to others, the evidence here admits of but one conclusion: Dr. Freund is an independent contractor.

dehydrated patient who lacked a spleen, to the overcrowded, unairconditioned Jail during the hot summer months constituted gross negligence and was violative of the applicable medical standard of care. Dr. Clark further maintains that, by not ordering a complete blood count in order to determine whether Stevenson's illness was in fact a viral, as opposed to bacterial, infection, Dr. Freund breached the ordinary standard of care and acted negligently. In addition, Dr. Clark states that the applicable standard of medical care required Dr. Freund, upon the diagnosis of dehydration, to treat immediately Stevenson with intravenous fluids.[84]

On this record, a material dispute of fact exists respecting whether Dr. Freund's actions amounted to negligence. *Compare with Coppage*, 906 F.Supp. at 1049 ("[Plaintiff] has presented expert testimony that Dr. Mann fell below the applicable standard of care in diagnosing Coppage's condition as converse reaction, in failing to order an MRI on July 12, in failing to transfer Coppage to another facility, and, after finding the need for further neurological testing, allowing a month to pass before Coppage received an MRI.... Accordingly, a reasonable juror could find Dr. Mann's actions to have been grossly

negligent."). Construed in favor of the Plaintiff, the record supports a finding that Dr. Freund failed to use the degree of care that an ordinary physician would have exercised to avoid injury to Stevenson. *Wilby*, 578 S.E.2d at 801. Dr. Freund's motion for summary judgment as to Counts VII and VIII, therefore, will be denied.[85] *Coppage v. Mann*, 906 F.Supp. 1025, 1049 (E.D.Va.1995); *Koffman v. Garnett*, 265 Va. 12, 574 S.E.2d 258, 260 (2003).

## CONCLUSION

For the reasons stated above, the Defendants' motions are granted in part and denied in part. The City of Richmond's Motion for Summary Judgment (Docket No. 46) is denied; except, to the extent that Count I is premised on allegations of unsanitary conditions at the Richmond City Jail, the City of Richmond's motion is granted.

Sheriff Michelle Mitchell's Renewed Motion for Summary Judgment (Docket No. 58) is granted as to Count II, but it is denied as to Count I and Count V to the extent that those counts rely on the allegedly overcrowded conditions at the Richmond City Jail. To the extent, however, that Count I and Count V are predicated

84. The record also contains lay witness testimony relevant to this issue. For instance, Peete, who, as recounted above, was incarcerated with Stevenson in 2001, has sworn by affidavit that he was "shocked" that the doctor returned Stevenson to the Jail after his clinic visit and that, had he be able to he "would have taken Stevenson to the emergency room of a hospital at that time because the severity of his illness was obvious." Affidavit of Peete, at 7 ¶ 54. Inmate Miles likewise has sworn by affidavit that "[w]hen Mr. Stevenson returned to the tier [from the clinic] it was obvious to me from his appearance that he was in a great deal of pain, was dehydrated, and was seriously ill." Affidavit of Miles, at 9 ¶ 66.

85. It is not clear, however, whether Brown may maintain both an action for wrongful

death and one for medical malpractice or whether, under Virginia law, the wrongful death claim merges with the medical malpractice action (or vice versa). *Cf. Gedrich v. Fairfax County Dept. of Family Servs.*, 282 F.Supp.2d 439, 477 (E.D.Va.2003); *Wertz v. Grubbs*, 245 Va. 67, 425 S.E.2d 500, 502 (1993); *Hagan v. Antonio*, 240 Va. 347, 397 S.E.2d 810, 812 (1990). It is also unclear whether the procedural requirements contained in Virginia's medical malpractice statute, Va.Code Ann. § 8.01–581.1 *et seq.*, apply in this federal action and, if they do, whether Brown has complied with such procedural requirements. The Court, therefore, will order Dr. Freund and Brown to submit briefing on these issues.

on allegations of unsanitary conditions at the Richmond City Jail, Sheriff Mitchell's motion is granted.

Finally, Dr. Jack Freund's Motion for Summary Judgment (Docket No. 49) is denied in its entirety.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.